## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHN DOE, | : | CIVIL ACTION NO. |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| FAIRFIELD UNIVERSITY, PHILIP LANE, | : | |
| KAREN DONOGHUE, CHRISTINE BROWN, | : | |
| and COLBY LEMIEUX, | : | |
| | : | |
| Defendants. | : | FEBRUARY 6, 2019 |

Plaintiff John Doe,[1] by his attorneys Nesenoff & Miltenberg, LLP, as and for his Complaint, respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.      This case arises out of the actions taken and procedures employed by Defendants Defendant Fairfield University ("Fairfield," "Defendant Fairfield" or the "University"), Philip Lane ("Defendant Lane"), Karen Donoghue ("Defendant Donoghue"), Christine Brown ("Defendant Brown"), and Colby Lemieux ("Defendant Lemieux") (collectively, "Defendants"), concerning allegations made against Plaintiff, a male student at Defendant Fairfield, during his senior year, as a result of false allegations of nonconsensual sexual activity with fellow Fairfield student Jane Roe.[2]

2.      Plaintiff seeks relief against Defendant Fairfield following Defendant Fairfield's wrongful and unjustified imposition of sanctions based on false and unproven allegations of sexual misconduct made by fellow Fairfield student Jane Roe. This injustice was the direct result of Defendant Fairfield's failure to: (1) conduct an adequate

---

[1] Plaintiff herewith files a motion to proceed pseudonymously.
[2] Complainant will be referred to as "Jane Roe" throughout the Complaint in order to maintain her anonymity.

investigation; (2) provide Plaintiff with due process as defined by Defendant Fairfield's own policies; and (3) excessively focus on the concerns and interests of the female complainant and the convenience of the University to the total exclusion of the rights and interests of the male accused.

3.     Defendant Fairfield's precipitous and unjustified actions violated its contract with Plaintiff, the applicable standard of care under Connecticut law, and the requirements of Title IX of the Education Amendments of 1972.

4.     Defendant Fairfield's arbitrary and capricious findings and action have derailed Plaintiff's education, tarnished his reputation, and permanently damaged his future career and educational prospects.

## The Parties

5.     Plaintiff John Doe is a natural person, citizen of the United States and resident of the State of Connecticut.   During the events described herein, John Doe was a student at Defendant Fairfield University and resided with classmates at an off-campus private residence in Fairfield, Connecticut.

6.     Defendant Fairfield University is a private, co-educational university located in Fairfield, Connecticut.

7.     Defendant Lane is a natural person and was a professor at Fairfield at all relevant times herein. Upon information and belief, Defendant Lane is a resident of the State of Connecticut.

8.     Defendant Donoghue is a natural person and was the Associate Vice President and Dean of Students at Fairfield at all relevant times herein. Upon information and belief, Defendant Donoghue is a resident of the State of Connecticut.

9.     Defendant Brown is a natural person and was the Title IX Compliance Coordinator and Director of Risk Management and Insurance at Fairfield at all relevant times herein. Upon information and belief, Defendant Brown is a resident of the State of Connecticut.

10.     Defendant Lemieux is a natural person and was the Assistant Director of Academic Support and Retention at Fairfield at all relevant times herein. Upon information and belief, Defendant Lemieux is a resident of the State of Connecticut.

11.     Plaintiff and Defendants Fairfield University, Lane, Donoghue, Brown, and Lemieux are sometimes hereinafter collectively referred to as "the Parties."

### Jurisdiction and Venue

12.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and under 28 U.S.C. § 1367 because: (1) the federal law claim arises under the constitution and statutes of the United States; and (2) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

13.     This Court has personal jurisdiction over Defendant Fairfield because it is conducting business within the State of Connecticut.

14.     This Court has personal jurisdiction over Defendants Lane, Donoghue, Brown, and Lemieux as they were employed by and acted as agents of the University during the relevant timeframe.

15.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

### FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

I.     **Background: Fairfield Faces Federal Pressure to Comply With Title IX**

16.     On April 4, 2011, the Office for Civil Rights (the "OCR") of the United States

3

Department of Education issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "Dear Colleague Letter" (the "DCL"). The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.* and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at p. 4.

17.     The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a nationwide campus rape epidemic and criticized the OCR for a lax response to what the report characterized as a social problem of critical importance. *See* http://www.npr.org/templates/story/story.php?storyId=124001493. The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (e.g. that women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sexual aggressor role.

18.     The DCL further relied on faulty statistics in sounding a "call to action" for campuses nationwide — that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL, at p. 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline…when discussing our country's problem with rape and sexual assault." *See* http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/. Relying on these faulty numbers, the DCL minimized

due process protections for the accused by, among other things, eschewing any presumption of innocence, mandating a preponderance of the evidence standard, limiting cross-examination, and forbidding certain forms of alternative dispute resolution.

19.     On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("Q&A") which was aimed at addressing campus sexual misconduct policies, including the procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." Q&A, at p. 12. The Q&A advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." *Id.* at p. 31. While the Q&A advised that "the rights established under Title IX must be interpreted consistently with any federally guaranteed due process rights…a school should ensure that any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant." *Id.* at p. 13.

20.     In April 2014, the White House issued a report entitled "Not Alone", which included a warning that if the OCR finds that a Title IX violation occurred, the "school risks losing federal funds" and that the Department of Justice ("DOJ") shares authority with OCR for enforcing Title IX, and may initiate an investigation or compliance review of schools. Further, if a voluntary resolution cannot be reached, the DOJ may initiate litigation.

21.     In June 2014, then Assistant Secretary of Education Catherine Lhamon testified before the United States Senate that if OCR could not secure voluntary compliance with the DCL from a college or university, it may elect to initiate an administrative action to terminate

federal funds or refer the case to the Department of Justice. To support enforcement of the DCL the OCR hired hundreds of additional investigators. To date, OCR has conducted 458 investigations of colleges for the potential mishandling of complaints of sexual violence. https://projects.chronicle.com/titleix/

22.     On September 1, 2014 the Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate."  "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014.

23.     A recent study by the Nation Bureau of Economic Research found that opening more Title IX investigations benefits the school in both its application submission rate and donations. "We find no evidence federal Title IX investigations reduce students' interest in a university. Instead, we find evidence that these investigations increase freshman applications and enrollment, for both female and male students. Federal Title IX investigations appear to have no effect on student retention, as the enrollment of continuing students is unaffected. We also find no effects on rates of degree completion. Our analysis of VSES data suggests that federal Title IX investigations have no detectable effects on donations. Interestingly, these same

data indicate that institutions respond to these investigations by soliciting donations from more alumni." Jason M. Lindo, Dave E. Marcotte, Jane E. Palmer, & Isaac D. Swensen, *Any Press is Good Press? The Unanticipated Effect of Title IX Investigations on University Outcomes*, 2018 Nation Bureau of Economic Research ,http://www.nber.org/papers/w24852

24.     For Fairfield University specifically, there has been financial gain to open Title IX investigations and find against the accused. Significantly, in 2018, Fairfield received a $299,954 federal grant to "Reduce Sexual Assault, Domestic Violence, Dating Violence and Stalking on Campus" from the Department of Justice Office of Violence Against Women ("OVW"). This was close to the maximum amount ($300,000) which could be awarded to an individual institution.

25.     The federal description for the OVW grant, which was authorized by the Violence Against Women Act, 42 U.S.C. § 14045b, states "the Campus Program encourages a comprehensive coordinated community approach that enhances victim safety, provides services for victims and *supports efforts to hold offenders accountable*. The funding supports activities that develop and strengthen victim services and strategies to prevent, investigate, respond to and *prosecute these crimes*… Colleges and universities should demonstrate to every student that these crimes will not be tolerated, that *perpetrators will face serious consequences*, and that holistic services are available for victims." Upon information and belief, Fairfield was awarded a $272,258 OVW federal grant based upon their application supporting the foregoing criteria. (emphasis supplied)

## II.     Defendant Fairfield's Policies and Contract with John Doe

### A. Plaintiff John Doe

26.     John Doe grew up in Odessa, Florida as one of four children raised in a Jesuit

family. He attended Catholic school in his youth, followed by Jesuit High School in Tampa for ninth through twelfth grades. Largely due to its Jesuit reputation, John Doe applied to Defendant Fairfield. Upon receiving an acceptance and scholarship offer from Defendant Fairfield, John Doe enrolled as a part of the Fairfield class of 2018.

27.     John Doe was an avid ice hockey player growing up and continued playing ice hockey at the University as part of the Fairfield Hockey Team. John Doe helped his team get to national championships each year and was invited to represent the American Collegiate Hockey Associate (the "ACHA"), of which Defendant Fairfield was a member. He also represented the ACHA in the all-star tournament in Eastern and Northern Europe.

28.     At Fairfield, John Doe volunteered regularly at St. Vincent's Hospital and the Caroline House, a literacy education center that serves low-income women and children with English as a second language, life skills, citizenship, preschool and children's tutoring programs.

29.     Academically, John Doe did very well at Fairfield, majoring in biology with a religious studies minor. John Doe was inducted into Theta Alpha Kappa, the National Honor Society for Religious Studies, but was prohibited from physically attending the induction, as he was restricted from campus due to the events described in greater detail herein.

30.     Because of John Doe's success at Fairfield, his parents had his younger brother transfer to Fairfield as well. His mother also volunteered for Fairfield's admissions office, helping to recruit other Jesuit families to attend Fairfield, because of her support of the University.

31.     John Doe was formally diagnosed with ADHD, of which Defendant Fairfield was fully informed.

32.     Prior to the alleged incident in September 2017, John Doe never had any disciplinary problems at Fairfield.

33.     In early 2018, John Doe was accepted to three graduate programs for possible attendance after graduation from Fairfield: University of South Florida Master of Science in Medical Sciences; Temple University Post-Baccalaureate Pre-Health Program; and Georgetown University's Complementary & Alternative Medicine master's program.

**2. <u>Agreements, Representations, Covenants and Warranties Between Plaintiff and Defendant Fairfield</u>**

34.     Upon commencing his education at Fairfield, John Doe received the  Fairfield Student Handbook, which contained the policies and procedures of the University (hereinafter, the "Original Policy"). John Doe, along with all other Fairfield students, was required to read the Original Policy and provide an electronic signature, acknowledging review and understanding of the Original Policy.

35.     The Original Policy provides that Defendant Fairfield is an anti-discriminatory institution, and that "[i]t does not discriminate on the basis of sex, race, color, marital status, sexual orientation, gender identity, veteran's status, political ideology, religion, age, national origin or ancestry, disability or handicap in administration of its educational policies, admissions policies, employment policies, scholarship and loan programs, athletic programs, or other University-administered programs." *See* Original Policy, p. 11.

36.     Defendant Fairfield specifically claimed to act justly towards individuals, like John Doe, with disabilities. According to the Original Policy, "Fairfield University is committed to providing qualified students with disabilities an equal opportunity to access the benefits, rights, and privileges of its services, programs, and activities in an accessible setting." *See* Original Policy, p. 16.

37.     Similarly, the Original Policy stated that "Fairfield University values, celebrates, and supports a diverse living and learning community. Consistent with this and with the law, Fairfield University does not discriminated on the basis of race, color, sex, sexual orientation, gender identity, gender expression, marital status, veteran's status, political ideology, religious, national or ethnic origin, age, or disability in the administration of educational policies or programs, admission and employment policies, scholarship and loan programs, and athletic and other school-administered programs. *See* Original Policy, p. 46-47.

38.     Included within the Original Policy was Fairfield's Sexual Misconduct Policy which defines non-consensual sexual intercourse as, "any sexual intercourse, however slight, with any object, by a person upon a person, that is without consent and/or by force." *See* Original Policy, p. 62-63.

39.     The Original Policy outlines the rights of the parties, including the respondent, by stating:

> 1. The right to review the information against him or her, including the nature of the alleged violations, the documentation of those violations, and the names of adverse witnesses and the information they provided.
>
> 2. The right to present one's case and to rebut unfavorable inferences that might be drawn.
>
> 3. The right to present the information of any qualified and competent witness who has direct, personal knowledge of the incident or conduct in question. Unless otherwise provided for and/or required by federal or state laws, the accused may request the assistance of an advisor who is a member of the University community. For Student Conduct Board hearings, the witness must submit a written statement at least 48 hours prior to the hearing before the witness will be allowed to appear at the hearing.
>
> 4. The right to be absent from a hearing without excuse. However, the case will be heard without the student present and a decision rendered based upon the evidence or information available.
>
> 5. The right to be advised of the result of the hearing and the rationale for the

decision within three business days for DHSM cases.

6. Unless otherwise provided for and/or required by federal or state laws, the respondent may request the assistance of an advisor who is a member of the University community (faculty, staff, or fellow student). The advisor serves as a support person and will offer assistance to the student before and during the hearing. The advisor may not address the board; however, he or she can ask questions of the witnesses if these questions are relevant to the case and have not been asked before.

7. If the case is heard by the Student Conduct Board, the student has the right to delay the scheduling of a hearing date for up to five days if a legitimate excuse has been established in the opinion of the dean of students. If the case is heard by the Peer Conduct Board or student conduct administrator, the student has the right to delay the scheduling of a hearing date for up to three days if a legitimate excuse has been established in the opinion of the dean of students

Original Policy, p. 108.

### III.    <u>The Night of September 29, 2017</u>

40.     John Doe and Jane Roe met during the Fall 2016 semester. They had met through mutual friends and began to spend time together almost every day. On three separate occasions, Jane Roe had invited John Doe to sleep over. John Doe slept over in Jane Roe's room, but the two did not engage in any intimate or sexual activity. The large extent of their intimate activity was cuddling. John Doe initially refused to have a physical relationship with Jane Roe as she had wanted, because Jane Roe had a boyfriend. However, after Jane Roe told John Doe that she broke up with her boyfriend, the two did engage in consensual oral sexual activity on one occasion in mid-September 2017.

41.     On the evening of September 29, 2017, approximately a week after the consensual oral sexual activity, both John Doe and Jane Roe separately attended the President's Ball, a social function at the University. Jane Roe approached John Doe to say hello. Later in the evening, Jane Roe invited John Doe to join her and her friends at Seagrape, a local bar. John Doe agreed and left with Jane Roe and her friends.

42.     Jane Roe claims to have had one or two drinks at the Seagrape. Upon leaving, Jane Roe and John Doe decided to walk back to John Doe's off-campus residence. Once inside, they talked and kissed, and John Doe invited Jane Roe to his room, which Jane Roe accepted. Jane Roe sat on John Doe's roommate's bed and the two continued kissing. John Doe and Jane Roe both undressed themselves. John Doe then asked Jane Roe "do you want to have sex?" as she was grabbing his penis. Jane Roe verbally agreed and they then proceeded to have sex.

43.     Later in the evening, John Doe's roommate, "T.Z.," came home and entered their shared bedroom. As he would later explain to Public Safety during the course of investigation, T.Z. saw Jane Roe in bed with John Doe and had a short conversation with them. T.Z. stated he had waited to enter the room because he had heard the couple having sex, that he did not hear any sounds of distress, and that everything seemed normal when he eventually interested the room. that everything seemed normal.  T.Z. also stated that Jane Roe made visits to see John Doe and engage in further sexual activity after the night of the night of September 29, 2017.

44.     Before they both fell asleep, Jane Roe asked for clothing to sleep in, and John Doe lent her some of his clothing. The next morning, John Doe drove Jane Roe home. Jane Roe texted John Doe and said "We're in the clear, everyone was asleep besides [Witness K.P.] and I can handle her. Thanks for the ride and the clothing.".  John Doe replied "No problem kid," and Jane Roe responded again stating, "Have fun with the fam squad[3] today."

45.     In the days following, John Doe and Jane Roe continued to exchange friendly text messages and see each other. On October 3, 2017, Jane Roe texted John Doe that she would "let him know when [she is] heading over." On October 5, 2017, Jane Roe told John Doe she was at Seagrape and that he should come join her. On this same day, she and John Doe

---

[3] "Fam squad" is a slang terms sometimes used to refer to family.

engage in consensual intercourse, which Jane Roe later admits multiple times throughout the forthcoming disciplinary process as well as in the incident report. On October 6, 2017, John Doe and Jane Roe had a conversation about a barbeque.

46.     On October 11, 2017, John Doe decided he no longer wanted to pursue a romantic or sexual relationship with Jane Roe and sent her a text message saying so. Jane Roe responded that she understood and that they would still be friends.

47.     At some point after John Doe and Jane Roe engaged in sexual intercourse, Jane Roe went to the health clinic and asked for an STD test. She did not report sexual misconduct or assault and did not ask for a rape kit. Upon information and belief, months after her visit to the health clinic for an STD test, when Jane Roe had gone to the health clinic and asked them to change her records to indicate that she had previously claimed to have been sexually assaulted.

48.     One of Jane Roe's friends "G.C." approached John Doe on or about November 28, 2017, after seeing John Doe with his ex-girlfriend and verbally attacked him, stating he "should be in jail for what he did to [Jane Roe] ." John Doe was extremely confused by that statement, as he had no idea to what she could be referring, and had never heard – from Jane Roe or anyone else – any claims of improper behavior.

### IV.     Jane Roe's Report of Sexual Misconduct Against John Doe

49.     On December 6, 2018, over two months after John Doe and Jane Roe engaged in sexual intercourse on the evening of September 29, 2017, Jane Roe went to Defendant Fairfield's Department of Public Safety to file a report against John Doe for alleged sexual misconduct. Notably, Jane Roe made this allegation after John Doe stared dating a mutual friend. DPS then forwarded the report to Defendant Donoghue, who sent an email to John Doe stating that the matter was being referred to the University Disciplinary Process for alleged

policy violations of the Original Policy. The letter stated John Doe could not have any contact with Jane Roe.

50.     In reporting her claims of sexual misconduct to DPS and in subsequent interviews thereafter, Jane Roe claimed a much different story than John Doe's, with regards to the evening of September 29, 2017. While Jane Roe agrees on all facts leading up to sitting on John Doe's roommate's bed, she claimed that John Doe lifted her onto his bed, immediately lifted her dress, pulled off her underwear and sexually assaulted her. She also conflicted her own claim and admitted that she then took off her own dress to "see fully what was going on" and that she went into "survival mode." She further stated that she laughed at John Doe and said, "Are you kidding me?" after John Doe pulled up her dress but simultaneously admitted she took off her own dress. Jane Roe also claimed that John Doe then rotated Jane Doe's body and vaginally penetrated her from behind. In fact, Jane Roe gave multiple and various accounts of the events of September 29, 2017 to the Department of Public Safety ("DPS"), Fairfield staff, and her own friends.

51.     Jane Roe provided witness testimony of her friends that she spoke to following September 29th. In other words, all of the witness testimony proffered by Jane Roe was from hearsay witnesses who simply repeated Jane Roe's own allegations.

52.     For example, in a text from Jane Roe to her friend "M.R." on September 30, 2017, Jane Roe claimed, "[John Doe] literally stuck his penis inside of me without any real consent and without a condom and it didn't feel good" and "He is kinda a fuck boy.[4]" Notably, Jane Roe provided these texts in a redacted form, where portions of the same conversation were blacked out. Jane Roe refused to disclose an unredacted copy of this conversation, and

---

[4] "F*** boy" is a slang term commonly used to describe someone who is only interested in a sexual encounter rather than a committed relationship. Hereinafter, the expletive portion of the slang term has been redacted.

Defendant Fairfield declined, against John Doe's protests, to require Jane Roe to provide a full and accurate record in support of her claims.

53.     M.R. also made a statement later, during one of the subsequent disciplinary hearings, that there has been gross mishandling from Defendant Fairfield University on the case because if Jane Roe had not persisted the case would have been swept under the rug, and that she does not know John Doe well. Upon information and believe, M.R.'s statement contributed to Defendant Fairfield's biased treatment against John Doe.

54.     M.R. further stated that Jane Roe and her roommate "A.B." were both interested in John Doe, which caused a rift in their house and friendship. She also explained that her housemates took A.B.'s side and created a hostile environment for Jane Roe. However, upon information and belief, Defendants failed to investigate this information as a possible motive for Jane Roe's fabricated inconsistent stories and false allegations.

55.     The witness statement given by K.P., Jane Roe's housemate, recollected that John Doe was pursuing both A.B. and Jane Roe. She was aware John Doe and Jane Roe left the ball together and Jane Roe did not come home the night of September 29, 2017. It had not been until October 21, 2017, almost a month after the night of the alleged incident and *after* John Doe broke up with Jane Roe, that Jane Roe claimed to K.P. that what happened was not consensual.

56.     Another witness, S.C., statement said they ran into Jane Roe at a bar in late October where Jane Roe introduced herself as "The House Whore." She had been drinking and the witness sat and talked to her about why she would call herself that. Jane Roe told the witness that John Doe "raped" her. In this version of her story, Jane Roe told the witness she blacked out from alcohol consumption, passed out in John Doe's bed, and woke up to him

inside of her. This was a different version of the story than she had told others (which were also inconsistent from one another). When Jane Roe retold the story to the same witness later, she changed her story, stating that said she had not had any alcohol that night, but on the original account to the witness, Jane Roe claimed that she had blacked out. The witness stated in his interview that he doubted the validity of Jane Roe's story.

57.     On January 23, 2018, Christine Brown sent John Doe a notice of the alleged incident and full allegations for the first time. In the letter, Defendant Brown wrote, "I am informing you about the nature of the complaint and initiating the Title IX investigation process. This matter has been referred to the Title IX Compliance Investigator, Officer Pat Jacquot, and he will be completing an investigation of this complaint related to the Fairfield University Nondiscrimination and Harassment, or Sexual Misconduct Policies as a form of gender-based discrimination." According to the Original Policy, the investigation was supposed to be performed by the Assistant Dean of Students.

58.     Perplexingly, mere minutes later on the same day, Defendant Brown sent John Doe a second letter, informing him that she was already in receipt of Officer Jacquot's investigation. This letter stated, "This letter serves to inform you I am in receipt of a Title IX investigation report related to an alleged incident that took place on September 29, 2017 and your name was provided as an alleged involved party. This matter is being referred to the University Disciplinary Process because of alleged policy violations of the University Student Conduct Code." However, the "investigation report" Defendant Brown referred to was merely the incident report compiled by DPS, and not a Title IX investigation report.

59.     Only approximately five minutes had passed between John Doe's first notice that an investigation was launches and the notice informing John Doe that the investigation had

been completed.

**V.      Fairfield's Failure to Conduct a Thorough, Impartial, and Fair Investigation and Hearing**

60.      Defendant Fairfield failed to launch a proper investigation over Jane Roe's claims. Instead, the "investigation" purely entailed an incident report consisting of statements from Jane Roe and hearsay witnesses, which were insufficient contents of an investigative report, according to the Original Policy.

61.      Defendant Fairfield demonstrated bias and preference toward Jane Roe over John Doe. For example, Defendant Donoghue sent John Doe an email listing all of the campus facilities that Jane Roe was using and informed John Doe he was not to use them. The same was not sent to Jane Roe, as all responsibility to avoid contact was put on John Doe. Therefore, John Doe was barred from a significant portion of campus. Further, this was done prior to the hearing or any finding of fault.

62.      Additionally, Defendant Fairfield's Policy restricted John Doe's choice of advisor to a member of the Fairfield community. This deprived John Doe of the rights afforded to him and other respondents by the OCR, which provides that when resolving allegations of dating violence, domestic violence, sexual assault, or stalking, a postsecondary institution must afford participants with the opportunity to be accompanied to any related meeting or proceeding by the <u>advisor of their choice</u>.[5] However, John Doe was deprived of an attorney as his advisor, and instead told he could only bring a member of the Fairfield community.

63.      John Doe's initial hearing was on February 9, 2018 (the "First Hearing") and included Defendant Lemieux on the hearing board (the "Hearing Board"). Defendant Lemieux was a staff member at the University who had previously worked closely with Jane Roe in the

---

[5] 34 C.F.R. § 668.46(k)(2)(iii)

Student Affairs Office and had a clear conflict of interest. This was uncovered during the First Hearing, when Jane Roe stated that Defendant Lemieux knew how the alleged sexual misconduct affected Jane Roe, because Defendant Lemieux and Jane Roe used to work beside each other. John Doe's advisor, Brian Walker, later confronted Defendant Brown about this clear conflict of interest. Defendant Brown told Mr. Walker that she had been aware of Jane Roe and Defendant Lemieux working together, but that Defendant Lemieux had assured Defendant Brown that she could be impartial. Therefore, Defendant Lemieux was neither dismissed nor recused herself from the Hearing Board.

64.     Furthermore, Jane Roe failed to come forward about the clear conflict, as necessitated by the Original Policy, which directed the parties to inform the Title IX compliance coordinator in writing within three business days of any conflicts of interest with regard to selected members assigned to the Hearing Board. Despite this directive, Jane Roe did not identify the conflict between herself and Defendant Lemieux.

65.     Defendant Lane was another Hearing Board member for the First Hearing. Defendant Lane, however, also served on the Sexual Assault Campus Resource Team ("SACRT") along with both Defendant Donoghue and Defendant Brown. SACRT describes its mission as working "to provide students with a collaborative, survivor-centered, team response to sexual assault and ensure a transition from victim to survivor for every individual whose life is impacted by sexual violence." *See* https://www.fairfield.edu/undergraduate/student-life-and-services/office-of-the-dean-of-students/be-safe/contacts-resources/ (emphasis added) Upon information and belief, Defendant Lane was biased towards female accusers in a sexual misconduct investigation.

66.     The 2011 Dear Colleague Letter states that "The Title IX Coordinators should not

have other job responsibilities that may create a conflict of interest. For example, serving as the Title IX Coordinator and a disciplinary hearing board member or general counsel may create a conflict of interest." However, both Defendant Brown and Defendant Donoghue were members of SACRT. Defendant Donoghue was also the Dean of Students. Additionally, while Defendant Brown was the Title IX Compliance Coordinator throughout John Doe's disciplinary process, she also held the position of Director of Risk Management and Insurance at Defendant Fairfield, creating a clear conflict of interest.

67.     During the First Hearing, Jane Roe was allowed to ask questions of witnesses herself. However, Jane Roe was not on the list of appropriate questioners, as described in the "Student Conduct Board Hearing Procedure," which stated that "[w]itnesses are questioned, if participating, by Board, by DOS representative, and by complainant and responding student(s) through the Board chair." (emphasis added).

68.     Jane Doe's advisor was allowed to hand a list of questions to the Hearing Board for them to ask of John Doe, which was against policy. Meanwhile, John Doe was not allowed to do the same. Furthermore, Jane Doe's advisor was also allowed to directly address the Hearing Board,  another clear violation of the Original Policy. Original Policy, p. 108.

69.     Additionally, Jane Roe presented witnesses who were not actual first-hand witnesses, but instead purely character and hearsay witnesses. This was in direct violation of the Policy, which limited witnesses to those individuals with "direct knowledge or specific information" regarding the alleged event. Original Policy, p. 108.

70.     Meanwhile, John Doe was barred from asking questions or submitting questions that witnesses could ask him. He was not allowed to bring character witnesses. Witnesses came into the First Hearing that were not on the list given to John Doe prior to the First Hearing, in

violation of the Original Policy. Original Policy, p. 108.

71.     Furthermore, John Doe was never given the opportunity to cross-examine the witnesses or Jane Roe at any point in the adjudicative process. The 6th Circuit Court of Appeals addressed the need for cross-examination opportunity in its recent decision in *Doe v. Baum*, No. 17-2213, 2018 WL 4265634, at *1 (6th Cir. Sept. 7, 2018), wherein the court held that cross examination is necessary where credibility is at issue. Specifically, where the university is choosing between competing narratives to resolve a case, the university must give the accused student or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder. *Id.*

72.     The court in *Baum* further held that:

> Cross-examination is essential in cases like Doe's because it does more than uncover inconsistencies—it 'takes aim at credibility like no other procedural device.' Without the back-and-forth of adversarial questioning, the accused cannot probe the witness's story to test her memory, intelligence, or potential ulterior motives. Nor can the fact-finder observe the witness's demeanor under that questioning. For that reason, written statements cannot substitute for cross-examination.

*Id.* at *4.

73.     John Doe and Mr. Walker, appealed the First Hearing on multiple grounds. On February 11, 2018, Mr. Walker sent a letter to Defendants Brown and Donoghue, alerting them to what he felt were blatantly inappropriate investigation and adjudication procedures, even under the New Policy.

74.     Mr. Walker identified as slew of procedural errors, writing:

1.     Inappropriate investigation procedure.

   a.     Initial report by complainant to the Department of Public Safety (DPS) should have immediately been remanded to the Title IX coordinator to handle

20

subsequent activities (in accordance with New Policy Section III). Instead, an investigation was begun by DPS, prior to Title IX coordinator's involvement. Lack of correct procedure by DPS set up a cascade of procedural problems in process.

b.      Respondent not informed of an opportunity for Request for Reconsideration of interim measures (in violation of New Policy Section IV.A.2).

c.      Lack of opportunity for advisor to be at initial meetings/investigation with DPS (in violation of New Policy Section IV.C.2).

d.      Respondent not informed who investigator(s) would be nor given opportunity to state conflict of interest (in violation of New Policy Section IV.C.3).

e.      As the investigation was premature, decision to encourage informal resolution as an option in this case was incorrectly suggested to parties (in violation of New Policy Section IV.B).

f.      Information stating right to submit written report to investigation not provided to respondent (in violation of New Policy Section IV.D.2).

g.      Photocopies of the investigative report were given to both parties (in violation of New Policy Section IV.D.2).

2. Process during First Hearing Board

a.      Conflict of interest between one board member and complainant was disclosed during hearing.

b.      One board member, Defendant Lane, showed obvious body language and

gestures that indicated to respondent and advisor that he had a prejudiced opinion on the case.

c.      Albeit through the board chairperson, both Advisors were directly involved with questioning (both advisors directly wrote questions and submitted them to be asked to the board chair in violation of New Policy Section IV.C.2).

d.      Self-questioning of complainant, who is not included in the list of appropriate questioners, occurred (List of questioners: 1. Board, 2. DPS rep, 3. Respondent)

e.      Respondent was not allowed the same opportunity to subsequently submit questions to be asked back to them.

f.      At least one of the complainant's witness report/support documents was not included in the provided documents to respondent.

75.    Along with Defendants Brown and Donoghue, the letter of grievances and violations was sent to Richard Greenwall, Fairfield's Dean of the College of Arts & Sciences, Christine Siegel, Fairfield's Provost, and Mark Nemec, President of Fairfield University (who would later serve as John Doe's appellate officer despite having been made aware of John Doe's grievances).

76.    On February 12, 2018, Defendant Fairfield acknowledged the violations that occurred during the hearing, including: (i) the conflict of interest with Defendant Lemieux; and (ii) the fact that John Doe did not receive copies of all documentation submitted to the Board, specifically a copy of the statement provided by witness B.H., which could have helped John Doe as it spoke of how Jan Roe would not have had time to consume alcohol prior to the President's Ball – in contrast to her occasional version of her story wherein she blacked out

from alcohol consumption. The First Hearing was nullified.

77.     After the First Hearing, John Doe reported to the University that Jane Roe was spreading information about the First Hearing to non-involved parties. The University merely sent Jane Roe an email telling her not to do so. However, upon information and believe, Jane Roe did not incur any consequences for the breach of confidentiality.

78.     On February 16, 2018, Mr. Walker informed Defendant Brown that a student approached had told him that Jane Roe was telling people that John Doe was filing a counter-claim against her. No action was taken by Defendant Fairfield with regard to Jane Roe's malicious communication of inaccurate and damaging information about John Doe.

**VI.     Fairfield Implements New Policies in Second Hearing**

79.     John Doe's new hearing was scheduled for March 9, 2018 (the "Second Hearing").

80.     John Doe expressed concern Defendant Brown before the Second Hearing that the time stamps of the documents Jane Roe submitted were incorrect. In particular, Jane Roe submitted emails between herself and her friends, and those emails had questionable time stamps and blacked out portions of conversation. John Doe's concerns centered whether the text messages were set up by Complainant, particularly requesting that her friends ask her certain questions in order to build "evidence." However, no action was taken by Defendant Fairfield in response to these  concerns.

81.     Notably, Jane Roe did not submit her medical records to the Hearing board.  As explained above, Jane Roe went to the health clinic for STD testing after engaging in sexual intercourse with John Doe. At that time, she did not report that she had been sexually abused or assaulted, but solely requested STD testing. In fact, the medical provider noted that Jane Roe

reported being okay with her sexual encounter. In or around December 2017, after filing her complaint against John Doe with DPS, Jane Roe returned to the clinic and requested that her records be changed to state that she had reported being sexually assaulted on her previous visit – essentially asking the health clinic to falsify records.

82.     On March 5, 2018 the Second Hearing was held.

83.     The Second Hearing was conducted under a new student handbook that purportedly took effect January 1, 2018 (the "New Policy"), instead of the Original Policy that existed at the time of the alleged incident, and which governed the First Hearing. As such, John Doe was subjected to the rules and policies that were not in place during the alleged incident.

84.     The New Policy allegedly went into effect January 1, 2018. However, an email was sent to the entire student body in January 2018, informing them that there was no change to the student handbook. Therefore, John Doe proceeded under the impression that the original handbook, containing the Original Policy, was still in effect as it had been at the time Jane Roe filed a claim with DPS on December 9, 2017.

85.     John Doe was not made aware of the New Policy and its governance over the disciplinary proceeding until he was given a copy of the New Policy after the First Hearing in February 2018. John Doe received correspondence from Defendant Donoghue on February 2, 2018 – before the First Hearing had been conducted – informing him that the Second Hearing was to follow the New Policy, despite the fact that the investigation and First Hearing had both been conducted in accordance with the Original Policy.

86.     Defendants' back-and-forth between the Original Policy and New Policy was confusing. While John Doe was informed that the First Hearing was governed by the Original Policy, he had received a copy of the New Policy before the First Hearing had occurred. The

letter sent to John Doe, stated: 'The sexual misconduct policy (as amended) is effective as of

January 1, 2018. Complaints made or claims reported prior to January 1, 2018 will generally be

reviewed under the prior Sexual Misconduct policy, unless otherwise determined by the Title

IX compliance coordinator in his/her sole discretion, with respect to continuing or ongoing

violations or other pertinent circumstances." Upon information and belief, this was not sent to

any other students except for John Doe. Other students received an email purely stating that

there was no change in policy.

87.    In addition to the conflicting information about the New Policy, Fairfield failed

to follow its *new* policies that, "the Title IX Coordinator shall appoint an ombudsperson who

will be responsible for issuing decisions on all Requests for Reconsideration of interim

measures. The ombudsperson shall be an external resource meaning that he/she is an individual

who is not a member of the Defendant Fairfield University community and is both fair and

impartial." This was not done. In fact, in March 2018, John Doe had requested permission to

use the University's gym, from which he was banned under the no-contact order, since he had

already paid for a membership. However, his request was denied without an ombudsperson –

the person who would decide such matters – being assigned.

88.    Furthermore, the four Hearing Board members in the Second Hearing did not fit

the roles the Original Policy required, specifically that the Hearing Board would be comprised

of "a four-member body consisting of one voting academic dean, assistant dean or

academic administrator, one voting faculty member, one administrator, and a non-voting

chairperson. If an academic dean or faculty member is not available, an administrator

can substitute the position on the board." Original Policy, p. 106. Additionally, it was

unclear to John Doe whether the New Policy allowed for the Hearing Board of the Second

Hearing.

89.     Instead of being given a clear list of rules and guidelines to govern the Second

Hearing, John Doe was given a sheet of paper absent from either Policy, which claimed it to a

the "Student Conduct Board Hearing Procedure" and further stated that such procedure was

"not publicly published anywhere." " Notably, the so-called Procedure, which was merely a list

of random phrases without description, and not published in any Fairfield policy, stated that the

Dean of Student "approves or amends Board's recommendations." Such a rule is absent from

both the Original Policy and the New Policy and presents a lack of fairness, considering the

Dean's clear conflict of interest, as a member of the Sexual Assault Response Team and the

person in charge of educating students and new student leaders on how to identify and report

sexual misconduct.

90.     During the Second Hearing, Jane Roe threatened John Doe by publicly stating,

"if my dad knew about this, he would kill you." Neither Defendant Fairfield nor the

Department of Public Safety followed up on this threat nor took action against Jane Roe until

John Doe's parents got involved.

91.     During the Second Hearing, John Doe endured being referred to as a "rapist"

and threatened to be killed. All the while, John Doe was barred from being able to defend

himself, in clear violation of the Original Policy's "Right of Respondent" which states that a

respondent has the right "to present one's case and to rebut unfavorable inferences that may be

drawn." Original Policy, p. 108. Instead, John Doe had to sit and listen to false allegations and

accusations that he was a "rapist" while unable to rebut the false claims.

### VII.    John Doe Appeals Decision and Seeks Disability Accommodations

92.     On March 9, 2018 John Doe was found Responsible for non-consensual sexual

intercourse (the "Decision"). As a result of this finding, John Doe was restricted from all Fairfield University activities including classes, commencement, and co-curricular experiences (the "Sanction"). While John Doe was able to continue to do coursework in order to complete his degree, it had to be done from home or any location outside of the classroom.

93.     By mid-March 2018, with the semester half completed, no notification had been sent to John Doe's professors informing them of the hearing outcome and the accommodations he would need to complete his coursework. This resulted in his advisor having to email the Provost to request notifications.

94.     John Doe appealed the Decision and Sanction. On March 8, 2018, Defendant Brown informed Mr. Walker by email that Kevin Lawlor would be acting as appellate officer for John Doe's appeal. John Doe wrote to Defendant Brown on March 14, 2018 to voice his objection to Kevin Lawlor serving as an appellate officer. John Doe submitted a written explanation stating that Mr. Lawlor had a conflict of interest due to the fact that Ms. Lawlor was the father of four daughters, and social scientists had reported that men who have only parented daughter have more empathy for women. John Doe also explained that Defendant Lane, who is the father of only daughters, had previously displayed a clear and blatant anti-male bias throughout the aggressive and harassing questioning during the First Hearing. Defendant Brown denied John Doe's request.

95.     Mr. Lawlor later recused himself for an undisclosed reason. Instead, Defendants appointed President Nemec as the appellate officer, despite his conflict of interest as a recipient of Mr. Walker's previous letter of grievances and violations in the investigative/adjudicative process.

96.     In the appeal, John Doe also identified a new witness who was not previously

questioned. Under both the Original Policy and New Policy, new evidence such as a new witness is grounds for an appeal. However, the witness identified in the appeal was not called in for an interview or questioned by any faculty, staff, or administration in connection with the disciplinary matter.

97.     President Nemec denied John Doe's appeal on March 27, 2018. Disappointingly, the letter did not give reason for the denial of John Doe's appeal, but instead simply stated: "This appeal did not provide new evidence or adequate evidence to substantiate an error in the proceedings." The letter did not address John Doe's identification of a new witness.

98.     John Doe sought special accommodations with regard to his classes, informing the University that due to his disability, he required time in the classroom in order to sufficiently retain information. John Doe engaged in multiple emails back and forth with Fairfield's Academic Accommodations, in an effort to obtain accommodations for his disability. In fact, two separate doctors sent letters to the University informing the University of John Doe's special needs. The University was also informed that laboratories were required elements to some of John Doe's classes, and therefore he needed to attend them in order to successfully pass certain classes.

99.     While working on John Doe's academic accommodations Defendant Brown originally informed John Doe that he could come back to campus and complete his labs, which naturally require a physical element, since there would be no way to complete labs sufficiently outside of the classroom. However, for unexplained reasons, Defendant Donoghue later stated John Doe was not allowed to attend his labs. John Doe was denied the academic accommodations he needed in order to successfully complete his education in light of his disability, which is recognized and protected under the ADA.

### VIII.   Defendants' Multiple Violations of Law and their Policies

100.   According to the Campus Sexual Violence Elimination Act (the "SaVE Act"), attorneys are permitted to serve as advisors. In fact, prior to the establishment of the SaVE Act, Section 485(f)(8)(B)(iv)(II) of the Clery Act clearly and unambiguously supports the right of the accused and the accuser to be accompanied to any meeting or proceeding by ''an advisor of their choice,'' which includes an attorney.  John Doe asked for an attorney and was denied.

101.   The SaVE Act further states that "state proceedings will be conducted by officials who do not have a conflict of interest or bias for or against the accuser or the accused." However, both disciplinary hearings were conducted by the Title IX Coordinator Brown, who is also a member of SACRT.

102.   The Act further requires a "prompt, fair, and impartial investigation and resolution," however the investigation opened on January 23, 2018 and was not resolved until March 22, 2018.

103.   Furthermore, John Doe filed eight separate complaints against Jane Roe which were not investigated, including: (i) complaints of Jane Roe harassing and defaming John Doe; (ii) Jane Roe requesting a University employee to change medical documentation; (iii) Jane Roe asking third parties to publicly accuse John Doe of rape; (iv) Jane Roe failing to divulge a personal relationship with a Hearing Board member who clearly possesses bias against John Doe; (v) Jane Roe contacting John Doe's housemates with threats in violation of the no-contact order, (vi) Jane Roe admitting to lying to University personnel; and (vii) Jane Roe creating a hostile environment that went ignored by the University.

104.   The Original Policy, governing the disciplinary proceedings at the time of the investigation, designated William Johnson as the proper investigator rather than Officer

Jacquot, stating: "Consistent with Title IX, Fairfield University has designated Christine Brown as Title IX Compliance Coordinator, and William Johnson at the Title IX Compliance Investigator." Original Policy, p. 46. This is important because Officer Jacquot merely took the incident report and interviewed Jane Roe's friends. This was before the report was sent to the Title IX office or John Doe was even questioned. Therefore, Officer Jacquot had a potential bias.

105.    Similarly, Defendant Donoghue's conflict of interest and bias is clear, as a donor to the Center for Family Justice, an organization that provides services for victims of sexual violence. Upon information and belief, this caused Defendant Donoghue to believe an accuser's allegations over the testimony of the accused.

106.    Most distressingly, John Doe was disadvantaged by Defendants' refusal to accommodate his request for accessibility based on his filed and registered disability. Instead of providing accessibility, John Doe was told he must either withdraw from courses or accept the grades he had to date. This was important because without the lab aspect of John Doe's courses, he could not pass, even if he had an A+ in the other aspects of the courses.

107.    Jane Roe chose to physically leave the Fairfield campus to complete her courses from home in Massachusetts, and was given accommodations to virtually attend Fairfield, but John Doe was banned from campus and not given such accommodations.

108.    Defendant Fairfield cultivated a culture of fear for male students and misunderstanding and confusion of Fairfield's policies. Fellow student J.M. stated in correspondence with John Doe's family that he "often found a very tense and aggressive mentality toward the misconduct policy and that there was never a really a clear set of rules of engagement." He recounted that "[d]uring the summer orientations, there would be several talks

on misconduct and after one such talk I found that it was very combative and along the lines of vindictive." Regarding the University's atmosphere with regards to the subject of sexual misconduct allegations, J.M stated it was "along the vindictive line and there really is not [a] clear cut way to respond to alleged incidents that was shown to the students."

109.    Upon information and believe, Fairfield was aware of the troubling manner in which they handle Title IX complaints and the possibility of such information becoming public, and therefore chose not to renew Defendant Brown's contract, instead seeking a replacement for the position of Title IX Coordinator. Upon information and belief, Fairfield accepting applicants for the position as recently as November 2, 2018.

## COUNT I
### Violation of Title IX of the Education Amendments of 1972

110.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

111.    Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681) ("Title IX"), provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

112.    Title IX applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX, even though there is very little direct federal funding of school sports.

113.    For the year ending June 30, 2017, Defendant Fairfield had received $3,329,695.00 in government grants and contracts. *See* Fairfield 2016-2017 Audit; https://www.fairfield.edu/media/main-site/2017-18/documents/finance/9278_finance_fairfield-university-final-2017-report_12052017.pdf

114.    Both the Department of Education ("DOE") and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or the regulations thereunder.  34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[6]

115.    The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also "accord[] due process to both parties involved."[7]

116.    The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to  complaints alleging [sexual] harassment";

- "Adequate, reliable and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint . . . ."[8]

117.    Title IX also obligates schools to make sure that all employees involved in the conduct of the procedures have adequate training as to what conduct constitutes sexual

---

[6] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties—Title IX* (2001) at 19-20, 21 & nn. 98-101.
[7] *Id.* at 22 (emphasis added).
[8] *Id.* at 20.

harassment, which includes "alleged sexual assaults."[9]

118.    The Code put in place by Defendant Fairfield deprived Plaintiff, on the basis of his sex, of his rights to due process and equal protection.   The Code discriminates against all respondents, who are habitually male.  Specifically:

- A single, typically female, investigator is responsible for independently determining if the reported conduct violates the sexual misconduct policy, based solely on the information of the reporting party, before an investigation begins.

- The Title IX Compliance Coordinator will alone "assess the reported conduct to determine whether the circumstances pose a threat to the health or safety of the University community" by issuing a no contact order, suspending the student, or prohibiting the student from entering upon the University's property or participating in any University activity.

- The Title IX coordinator hand picks three investigators to investigate the report of alleged misconduct. Those three investigators return their report to the same Title IX coordinator who then independently and solely determines if a hearing board should be convened.

119.    Defendants failed and/or refused to follow Defendant Fairfield's existing policies and procedures when investigating the charges against Plaintiff.

120.    Defendant Fairfield's existing practices and procedures discriminate, on the basis of sex, against the male accused, including Plaintiff.  Defendant Fairfield conducted its investigation of the allegations against Plaintiff in a manner that was slanted in favor of the female accusers.

121.    Defendant Fairfield failed to provide Plaintiff an adequate opportunity to review and contest the specific allegations against him and did so without conducting a fair andequitable investigation and hearing. From the moment that Jane Roe filed her complaint, Defendant Fairfield treated Plaintiff as "guilty."

122.    Defendant Fairfield erroneously placed the entire burden on Plaintiff to prove

---

[9] *Id.* at 21.

his innocence, and despite the fact that Defendant Fairfield accommodates Plaintiff's disability in the classroom, failed to take into account Plaintiff's disability when ordering him to complete his coursework from home.

123.   Defendant Fairfield's policies effectuate a denial of due process for the student population, especially the male student population, because they are set up to encourage and facilitate false reports of sexual misconduct and/or other grievances without any recourse for the falsely accused.

124.   Defendant Fairfield's policies and procedures disproportionately affect the male population of Defendant Fairfield's community as a result of the higher incidence of female complainants of sexual misconduct versus male complainants of sexual misconduct.

125.   Defendant Fairfield has created an environment in which an accused male student is effectively denied fundamental due process by being prosecuted through the conduct process under the cloud of a presumption of guilt.   This one-sided process deprived Plaintiff, as a male student, of educational opportunities at Defendant Fairfield on the basis of his sex.

126.   Defendant Fairfield imposed sanctions on Plaintiff without conducting a fair, impartial investigation and without evidence that he engaged in non-consensual sex with Jane Roe.

127.   As a result, Plaintiff faces a permanent notation on his Defendant Fairfield transcript labeling him a sexual predator, even though he was never given an opportunity for a fair hearing.

128.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT II
### Violation of the Fourteenth Amendment of the United States Constitution
### Procedural Due Process

129.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

130.    On April 4, 2011, the United States, by and through its agent, the DOE, sent a 19-page "Dear Colleague" letter to colleges and universities all over the country, stating that "sexual violence" on campus was a form of "sexual harassment prohibited by Title IX" ("Dear Colleague Letter").

131.    Reversing previous federal policy, the Dear Colleague Letter threatened colleges and universities with hundreds of millions of dollars in de-funding penalties if they did not immediately begin investigating and adjudicating allegations of campus sexual assault under detailed procedures and terms dictated by the federal government.

132.    As a result of the Dear Colleague Letter and later statements, actions, and directives issued by the United States, colleges and universities were required to:

- Investigate and adjudicate campus sexual assault allegations regardless of whether the complainant reported his or her allegations to the police (whereas previous federal policy had permitted colleges to allow law enforcement to handle allegations of sexual assault);

- Establish a coordinated and centralized investigative and adjudicative procedure according to detailed rules mandated by the federal government and headed by a Title IX coordinator;

- Protect the anonymity of students accusing another student of sexual assault if the student making the allegations so requests;

- Apply a preponderance of the evidence standard when adjudicating such allegations (whereas previously colleges and universities frequently applied higher evidentiary standards, such as the clear and convincing evidence standard);

- Prohibit accused students from cross-examining witnesses; and

- Expel students found to have engaged in nonconsensual sexual intercourse with other students.

133.   Since 2011, the United States has consistently reaffirmed and adhered to the threat of substantial monetary penalties made in the Dear Colleague Letter.  For example,  in July 2014, DOE Assistant Secretary for Civil Rights Catherine Lhamon stated that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter.  "Do not think it's an empty threat," Lhamon warned.

134.   Upon information and belief, Defendant Fairfield acted in response to the federal government's threat that colleges refusing to comply would be found in violation of Title IX and be subject to extremely substantial, indeed crippling, monetary penalties.

135.   Accordingly, Defendant Fairfield was coerced by the United States into complying with the Title IX investigative and adjudicatory process mandated by the Dear Colleague Letter and by subsequent federal actions, statements, and directives.

136.   Defendant Fairfield applied the investigative and adjudicatory process dictated to it by the federal government when it investigated and adjudicated the complaint against Plaintiff.

137.   Under clear and controlling case law, a private actor required by the United States to investigate and adjudicate the violations of a federal statute under terms and procedures dictated by the federal government is a state actor when engaging in such investigation and adjudication.

138.   When Defendant Fairfield investigated and adjudicated the complaint made by Jane Roe against Plaintiff, and when it sanctioned Plaintiff, Defendant Fairfield was a state actor and was therefore required to honor the rights and guarantees set forth in the United States Constitution.

139.    In the course of Defendant Fairfield's investigation and adjudication, Defendant Fairfield flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its repeated acts of gender bias and deprivation of the minimal requirements of procedural fairness.

140.    Based on the foregoing, Defendant Fairfield was a state actor when it violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution during the investigation and adjudication of the sexual assault complaints against Plaintiff.

141.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT III
## Breach of Contract

142.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

143.    Based on the aforementioned facts and circumstances, Defendant Fairfield created express and implied contracts when Plaintiff accepted an offer of admission to Defendant Fairfield and paid tuition and fees.

144.    Based on the foregoing facts and circumstances, Defendant Fairfield breached express and implied agreement(s) with Plaintiff.

145.    Defendant Fairfield committed several breaches of its agreements with Plaintiff during the investigation process.   A non-exhaustive list of Defendant Fairfield's breaches include the following:

**A.  Fairfield Failed to Conduct an Equitable Investigation of Jane Roe's Claims**

146.    The Policy states that, in sexual misconduct cases, "Fairfield University's commitment to non-discrimination includes an assurance that the University will not tolerate discrimination or harassment on the basis of sex, sexual orientation or gender identity, including, but not limited to sexual violence, dating or domestic violence, or stalking, or retaliation, in its community. The Sexual Misconduct Policy is intended to guide the community on the University process to complaints of sexual misconduct, the resources available to individuals affected by sexual misconduct and the sexual misconduct prevention initiatives of the University. The Sexual Misconduct Policy applies to all University community members, and all members of the University community are responsible for being familiar with and abiding by the Sexual Misconduct Policy at all times."

147.    Defendant Fairfield breached its contract with Plaintiff by failing to provide procedural equity: i) The investigation report cited unsubstantiated statements and hearsay; ii) The investigation report included numerous instances of opinion and errors in reporting witness statements; iii) The investigation report was positioned to support Jane Roe's accusation of lack of consent; iv) Plaintiff was not given the opportunity to have a personal representative—particularly a representative from disability services—present for the hearing as allowed by the Code of Conduct and particularly necessary in light of Plaintiff's learning disability; vi) Plaintiff was forced to act as his own attorney during the hearing because his advisor was not allowed to speak, even though he clearly had trouble forming questions and communicating on his own behalf due to his disability; and vii) The Sanction was unwarranted and disproportionate in light of the circumstances.

    **B.**    **Fairfield Discriminated Against Plaintiff on the Basis of Sex**

148.    The Code expressly prohibits discrimination on the basis of sex. Code of

Conduct, p. 1.

149.    As set forth, *supra*, Defendant Fairfield breached its contract with Plaintiff because it conducted its investigation of the allegations against Plaintiff in a manner that was biased against him.  Through Defendants' biased investigation, which was slanted in favor of Plaintiff's accuser, Defendant Fairfield engaged in sex-based discrimination against Plaintiff.

### C.      Fairfield Failed to Apply the Proper Burden of Proof

150.    The Code provides that "All findings and determinations of responsibility under the Sexual Misconduct Policy will be made using a preponderance of the evidence standard. This standard requires the determination of whether it is more likely than not that a fact exists or a violation of the Sexual Misconduct Policy occurred.

151.    Defendant Fairfield breached its agreement with Plaintiff because the University failed to utilize the preponderance of the evidence standard when reaching its decision.

152.    As a direct and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, financial injuries, and other direct and consequential damages.

153.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

### COUNT IV
### Breach of the Covenant of Good Faith and Fair Dealing

154.    Plaintiff repeats and realleges every allegation hereinabove as if fully set forth herein.

155.    Based on all of the aforementioned facts and circumstances,  Defendant Fairfield

breached and violated the covenant of good faith and fair dealing implied in the agreement(s) with Plaintiff by meting out the disproportionately severe sanction of expulsion where there was a lack of credible evidence concerning the claims against him.

156.    As a direct, reasonable and foreseeable consequence  of  this  breach, Plaintiff sustained damages, including, without limitation, emotional distress, economic injuries, the inability to sufficiently complete his studies at Defendant Fairfield, impact on his future career and higher education prospects, and other direct and consequential damages.

157.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### COUNT V
### Negligent Infliction of Emotional Distress

158.    Plaintiff repeats and realleges every allegation hereinabove as if fully set forth herein.

159.    Defendant Fairfield owed duties of care to Plaintiff. Such duties included, without limitation, a duty of reasonable care in conducting the investigation of the allegations against him in a fair and impartial manner.

160.    Defendant Fairfield breached its duties owed to Plaintiff.

161.    Such breach by Defendant Fairfield created an unreasonable risk of causing Plaintiff emotional distress in that Plaintiff's academic and disciplinary record is irrevocably and irreversibly tarnished.

162.    As a direct and foreseeable consequence of Defendant Fairfield's actions, Plaintiff sustained tremendous damages, including, without limitation, severe emotional distress, loss of educational and career opportunities, economic injuries, and other direct and

consequential damages.

163.    Defendant Fairfield's extreme and outrageous conduct was the cause of Plaintiff's distress.

164.    Considering that Plaintiff's entire academic and future employment opportunities would suffer as a result of the adverse decision, Defendant Fairfield should have recognized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or harm.

165.    Plaintiff's distress is reasonable in light of Defendant Fairfield's conduct.

166.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

### COUNT VI
### Discrimination Based on Disability Under Title II of the ADA

167.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

168.    Plaintiff is a "qualified individual with a disability" as defined in 42 U.S.C. § 12131(2).

169.    The ADA and its implementing regulations require entities such as Defendant Fairfield to provide programs and services in an integrated setting and to make reasonable modifications in policies, practices, and procedures that deny equal access to individuals with disabilities.

170.    Plaintiff has been denied the modifications in Defendant Fairfield's practices, namely its sanction and resolution with regards to the allegations.

171.    As a result of Defendant Fairfield's denial of modification, Defendant

Fairfield violated the ADA by discriminating against Plaintiff due to his disability.

172.    As a direct and proximate result of Defendant Fairfield's unlawful discrimination, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT VII
## Estoppel and Reliance

173.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

174.    Defendant Fairfield's various policies constitute representations and promises that Defendant Fairfield should have reasonably expected to induce action or forbearance by Plaintiff.

175.    Defendant Fairfield expected or should have reasonably expected Plaintiff to accept its offer of admission, incur tuition and fee expenses, and choose not to attend other colleges based on its express and implied promises that Defendant Fairfield would not tolerate, and Plaintiff would not suffer, harassment by fellow students, and would not deny Plaintiff his procedural rights should he be accused of a violation of Defendant Fairfield's policies.

176.    Plaintiff relied to his detriment on these express and implied promises and representations made by Defendant Fairfield.

177.    Based on the foregoing, Defendant Fairfield is liable to Plaintiff based on estoppel.

178.    As a direct, reasonable, and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including without limitation, emotional distress, economic injuries, the inability to complete his studies at Defendant Fairfield, and other direct and

consequential damages.

179.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and Disbursements.

## COUNT VIII
## Declaratory Judgment

180.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

181.    Defendant Fairfield has committed numerous violations of the Parties' contracts and of federal and state law.

182.    Plaintiff's future has been severely compromised and damaged.   Without appropriate redress, the Sanction imposed as a result of Defendant Fairfield's biased investigation will continue to cause irreversible damage to Plaintiff's educational, career, and future employment prospects, with no end in sight.

183.    As a result of the foregoing, there exists a justiciable controversy between the parties with respect to the outcome, permanency, and future handling of Plaintiff's formal student record at Defendant Fairfield.

184.    By reason of the foregoing, Plaintiff requests, pursuant to 28 U.S.C.§2201, a declaration that: (i) the outcome and findings made by Defendants be reversed; (ii) the Sanction be reversed; (iii) Plaintiff's reputation be restored; (iv) Plaintiff's disciplinary record be expunged; (v) the record of Plaintiff's Sanction be removed from his education file; (vi) any and all records pertaining to the investigation be destroyed; and (vii) Defendant Fairfield's Code is unconstitutional as applied.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against

Defendant Fairfield University as follows:

(i)      on the first count for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, damages to compensate Plaintiff for the inability to complete his studies at Defendant Fairfield, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(ii)      on the second count for violation of the Fourteenth Amendment of the United States Constitution, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, damages to compensate Plaintiff for the inability to complete his studies at Defendant Fairfield, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(iii)      on the third count for breach of contract, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, damages to compensate Plaintiff for the inability to complete his studies at Defendant Fairfield, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(iv)      on the fourth count for breach of the covenant of good faith and fair dealing, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, damages to compensate Plaintiff for the inability to complete his studies at Defendant Fairfield, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(v)      on the fifth count for negligent infliction of emotional distress, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, damages to compensate Plaintiff for the inability to complete his studies at Defendant Fairfield, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(vi)      on the sixth count for discrimination based on disability under Title II of the

ADA, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, damages to compensate Plaintiff for the inability to complete his studies at Defendant Fairfield, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(vii)   on the seventh count for estoppel and reliance, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, damages to compensate Plaintiff for the inability to complete his studies at Defendant Fairfield, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(viii)  on the eighth count for a declaratory judgment pursuant to 28 U.S.C. § 2201, a declaration that (i) the outcome and findings made by Defendants be reversed; (ii) the Sanction be reversed; (iii) Plaintiff's reputation be restored; (iv) Plaintiff's disciplinary record be expunged; (v) the record of Plaintiff's Sanction be removed from his education file; (vi) any and all records pertaining to the investigation be destroyed; and (vii) Defendant Fairfield's Code is unconstitutional as applied.

## Jury Demand

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

**Dated:  February 6, 2019**

**Respectfully submitted,**

/s/ William Bilcheck, Jr.
William Bilcheck, Jr.
LAW OFFICES OF WILLIAM BILCHECK, JR.
12 Brookside Road
P.O. Box 281
Madison, Connecticut 06443
Email: madctatty@aol.com
CT Juris: 309654
Fed. Juris: 04402

**-and-**

/s/ Andrew T. Miltenberg

Andrew T. Miltenberg (*pro hac vice pending*)
Stuart Bernstein (*pro hac vice pending*)
Diana R. Warshow (*pro hac vice pending*)
Adrienne Levy (*pro hac vice pending*)
NESNOFF & MILTENBERG, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001
Email: AMiltenberg@nmllplaw.com
Email: SBernstein@nmllplaw.com
Email: DWarshow@nmllplaw.com
Email: ALevy@nmllplaw.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that he served Plaintiff's Complaint on all parties of record via the Court's CM/ECF system on February 6, 2019.

/s/ William Bilcheck, Jr.
William Bilcheck, Jr.
LAW OFFICES OF WILLIAM BILCHECK, JR.
12 Brookside Road
P.O. Box 281
Madison, Connecticut 06443
Email: madctatty@aol.com
CT Juris: 309654
Fed. Juris: 04402