# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHN DOE, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:19-cv-00212-WWE |
| | : | |
| v. | : | |
| | : | |
| FAIRFIELD UNIVERSITY, KAREN | : | |
| DONOGHUE, and CHRISTINE BROWN, | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**<u>PARTIAL MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .........................................................................ii-v

PRELIMINARY STATEMENT ........................................................................1

BACKGROUND .............................................................................................3

ARGUMENT ...................................................................................................9

    I. The Applicable Legal Standard ...........................................................9

    II. Plaintiff Alleged A Plausible Title IX Selective Enforcement Claim................9

        A.  Allegations Made "Upon Information And Belief" Satisfy
           *Iqbal/Twombly* ......................................................................9

        B.  Jane Roe Is A Reasonable Comparator................................13

    III. The Connecticut Supreme Court's *Gupta* Decision Does Not Preclude
       Plaintiff's State Law Claims .....................................................15

        A.  The Amended Complaint Is Replete With Allegations of Fairfield's
           Arbitrary, Capricious and Bad Faith Conduct...................15

        B.  Plaintiff Alleged A Plausible Breach of Contract Claim ..................19

        C.  Plaintiff Has Not Alleged A "Disguised Negligence" Claim.............31

        D.  The Student Handbook Disclaimer Does Not Preclude Liability ......32

        E.  Plaintiff Alleged A Claim For Breach of the Implied Covenant of
           Good Faith and Fair Dealing .............................................34

        F.  Plaintiff Alleged A Claim for Negligent Infliction of Emotional
           Distress ......................................................................36

    IV. Plaintiff Alleged A Plausible Disability Discrimination Claim ....................37

CONCLUSION...............................................................................................40

i

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Albert v. Carovano,*
    851 F.2d 561 (2d Cir. 1988).........................................................10,11,14

*Arista Records LLC v. Doe 3,*
    604 F.3d 110 (2d Cir. 2010)..............................................................12

*Bass v. Miss Porter's School*
    738 F. Supp. 2d 307 (D. Conn. 2010).........................................16,19,21

*Bercovitch v. Baldwin School, Inc.,*
    133 F.2d 141 (1st Cir. 1998)..............................................................37

*Burhans v. Yale University,*
    No. 3:12cv1462, 2014 WL 12758391 (D. Conn. 2014) .........................9

*Burns v. Quinnipiac U.,*
    120 Conn. App. 311 (Conn. App. Ct. 2010).......................................20

*Byra-Grzegorzyck v. Bristol-Meyers Squibb Co.,*
    572 F. Supp. 2d 233 (D. Conn. 2008).................................................22

*Campbell v. Plymouth,*
    74 Conn. App. 67 (2002) ..................................................................35

*Christian v. Town of Riga,*
    649 F. Supp. 2d 84 (W.D.N.Y. 20019) ..............................................10

*Davis v. Monroe County Bd. of Educ.,*
    526 U.S. 629 (1999)..........................................................................11

*Demoulas v. Quinnipiac University,*
    2015 WL 1427951 (Conn. Super. Ct. Mar. 5, 2015) ......................33,34

*Doe v. Amherst College,*
    238 F. Supp. 3d 195 (D. Mass 2017) .........................................22,24,29

*Doe v. Brown U.,*
    166 F. Supp. 3d 177 (D.R.I. 2016)..................................................12,14

*Doe v. Cummins,*
    622 Fed. Appx. 437 (66th Cir. 2016)..................................................25

*Doe v. French,*
    458 Fed. Appx. 21 (2d Cir. 2012).......................................................33

*Doe v. Quinnipiac U.,*
    2019 WL 3003830 (July 10, 2019)...........................................21,22,23,24,29,32

*Doe v. The Trustees of the U. of Penn.,*
    270 F. Supp. 3d 799 (E.D. Pa. 2017).................................................12,13

*Eiland v. Wolf,*
    764 S.W.2d 827 (Tex. Ct. App. 1989).................................................33

*Faigel v. Fairfield University,*
    75 Conn. App. 37 (Conn. App. 2003).................................................20

*Faraclas v. Botwick,*
    2002 WL 1727395 (Conn. Super. Ct. 2002).......................................36

*Gally v. Columbia U.,*
    22 F. Supp. 2d 199 (S.D.N.Y. 1998)..................................................22,33

*Gaudio v. Griffin Health Services,*
    249 Conn. 523 (1999).........................................................................33

*Girard v. Lincoln College of New England,*
    27 F. Supp. 3d 289 (D. Conn. 2014).................................................39

*Goodman v. President & Trustees of Bowdoin College,*
    135 F. Supp. 2d 406 (D. Me. 2001)...................................................22

*Gupta v. New Britain General Hospital,*
    239 Conn. 574 (1996).............................................................*Passim*

*Hawley Avenue Assocs. LLC v. Robert D. Russo, M.D. & Assocs. Radiology, P.C.,*
    130 Conn. App. 823 (2011)..............................................................20

*Hope Academy of Milford, Inc. v. Fortier,*
    2004 WL 944480 (Conn. Super. Ct. April 13, 2004)...........................33

*Jacobs v. Ethel Walker School Inc.,*
    2003 WL 22390051  (Conn. Super. Ct. Sept. 30, 2003)..................16,18,21,34,36

*Johnson v. Schmitz,*
 119 F. Supp. 2d 90 (D. Conn. 2000)...........................................................20,23,36

*Kent Literary Club of Wesleyan University v. Whaley,*
 2004 WL 2361686 (Conn. Super. Ct. Sept. 16, 2004).........................................33

*Mara v. McNamara,*
 2015 WL 439295610 (D. Conn. July 15, 2015) .........................................16,19,36

*Meyers v. Conshocken Catholic School,*
 2004 WL 3037945 (E.D. Pa. 2004) ......................................................................39

*Morris v. Yale U.,*
 2006 WL 908155 (D. Conn. April 4, 2006).........................................................21

*Osberg v. Yale U.,*
 2009 WL 659072 (Conn. Sup. Ct. Feb. 11, 2009)...............................................21

*Pickering v. Aspen Dental Mgmt., Inc.,*
 100 Conn. App. 793 (2007) ..................................................................................35

*Prasad v. Cornell University,*
 2016 WL 3212079 (N.D.N.Y. Feb. 24, 2016) ................................................10,13

*Reynolds v. Chrysler First Commercial Corp.,*
 40 Conn. App. 725 (1996) ....................................................................................20

*Ritter v. Oklahoma City U.,*
 2016 WL 3982554 (W.D. Okla. July 22, 2016)....................................................12

*Rolph v. Hobart & William Smith Colleges,*
 271 F. Supp. 3d 386 (W.D.N.Y. 2017) .................................................................10

*Rom v. Fairfield U.,*
 2006 WL 1493644 (D. Conn. 2006) .....................................................................31

*Ruegsegger v. Bd. of Regents of Western N. Mexico U.,*
 154 P.3d 681 (N.M. App. 2006) ...........................................................................22

*Stearns v. Bd. of Education for Warren Township High School District #121,*
 No 00 C 5818, 1999 WL 1044832 (N.D. I11. Nov. 16, 1999) .............................38

*Thibodeau v. Design Group One Architects, LLC,*
 260 Conn. 691 (2002) ...........................................................................................35

*Thurmon v. Mount Carmel High School,*
    191 F. Supp. 3d 894 (N.D.Ill. 2016) ......................................................................39

*T.K., Inc. v. Castleton Capital Corp.,*
    2013 WL 12293454 (D. Conn. May 30, 2013) ....................................................31

*Uhl v. Home Depot U.S.A., Inc.,*
    2010 WL 3282611 (E.D.N.Y. 2010) .....................................................................39

*Yusuf v. Vassar College,*
    35 F. 3d 709 (2d Cir. 1994) ...................................................................................10

*Young v. Hoffman,*
    970 F. 2d 1154 (2d Cir. 1992) ...............................................................................25

Plaintiff John Doe ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants' motion to dismiss Plaintiff's claims for Title IX selective enforcement (part of Count I),[1] breach of contract (Count II), breach of the implied covenant of good faith and fair dealing (Count III), disability discrimination under Section 504 of the Rehabilitation Act (Count IV), and negligent infliction of emotional distress (Count V), as alleged in Plaintiff's First Amended Complaint and Jury Demand (the "Amended Complaint"),[2] filed on May 30, 2019 (Doc. No. 30).

## PRELIMINARY STATEMENT

In moving to dismiss Plaintiff's well-pled Amended Complaint, Defendants put forth a number of theories—many of which are typically applied at the summary judgment stage—to argue that all but one of Plaintiff's claims should be dismissed. Defendants rely on a number of technical arguments, as well as mischaracterizations of Plaintiff's claims, in an effort to secure dismissal. Yet one need only review the Amended Complaint, and the relevant case law, to conclude that Plaintiff's claims satisfy the applicable pleading standard and Defendants' motion to dismiss should be denied in its entirety:

As set forth *infra* Point II, Plaintiff's Title IX selective enforcement claim should not be dismissed because Plaintiff has alleged a plausible basis for this claim, the allegations made "upon information and belief" concern information that is exclusively within the possession of Defendant Fairfield University ("Fairfield" or the "University"), and Jane Roe is also a reasonable comparator for purposes of this claim.

As set forth *infra* Points III.A, Plaintiff's state law claims against Fairfield satisfy the standards set forth in the Connecticut Supreme Court's decision in *Gupta v. New Britain General*

---

[1] Defendants have not moved to dismiss Plaintiff's Title IX erroneous outcome claim.
[2] The Amended Complaint will be cited herein as "AC."

1

*Hospital*, 239 Conn. 574 (1996), and should not be dismissed, because Plaintiff has plausibly alleged arbitrary, capricious and bad faith conduct.

As set forth *infra* Points III.B-D, Plaintiff's breach of contract claim against Fairfield should not be dismissed because, in accordance with *Gupta*, Plaintiff alleged that Fairfield failed to fulfill specific contractual promises set forth in its handbook and sexual misconduct policies. Plaintiff has not alleged a "disguised negligence" claim. Defendants' argument that a disclaimer on the cover of the University's 2017 Sexual Misconduct Policy precludes Plaintiff's claim for breach of contract has been flatly contradicted by recent case law.

As set forth *infra* Point III.E, Plaintiff has plausibly alleged a claim for breach of the implied covenant of good faith and fair dealing against Fairfield. Defendants' argument that this claim is precluded by Plaintiff's "available statutory remedies"— his Title IX and disability discrimination claims—is not supported by the case law that Defendants rely upon in putting forth this argument.

As set forth *infra* Point III.F, Defendants' argument that Plaintiff's claim for negligent infliction of emotional distress is precluded by *Gupta* is meritless because Plaintiff has alleged this claim against Defendants Karen Donoghue ("Donoghue") and Christine Brown ("Brown") in their individual capacities. Should the Court find that *Gupta* applies, the conduct alleged against these Defendants would also satisfy the "arbitrary and capricious" standard. In either case, this claim should not be dismissed.

As set forth *infra* Point IV, Plaintiff has alleged a plausible claim against Fairfield for disability discrimination under Section 504 of the Rehabilitation Act. In requesting an accommodation for his ADHD as part of the sanction issued by Fairfield—permission to attend certain labs and classes on campus after he was directed to finish his classes remotely—Plaintiff

was not asking Fairfield to modify its written disciplinary policies or procedures. The sanctions issued to students were discretionary and case-specific. Moreover, the Title IX complainant, Jane Roe, was no longer attending classes on campus. Section 504 of the Rehabilitation Act requires schools to account for a student's disabilities when imposing discipline.

As set forth fully below, the Court should deny Defendants' motion to dismiss and allow Plaintiff's claims to proceed to discovery.

## **BACKGROUND**

Plaintiff and Jane Roe met during the Fall 2016 semester. They were each in their Junior Year of college. After they met, they spent almost every day together and had sleepovers on at least three occasions where they engaged in cuddling. AC ¶ 123. Plaintiff initially refused to have a physical relationship with Jane Roe—which she wanted—because she had a boyfriend. AC ¶ 124.

By September 2017, Jane Roe had broken up with her boyfriend and the two engaged in consensual, oral sex on one occasion. *Id.* On September 29, 2017, Jane Roe invited Plaintiff to socialize at the Seagrape, a local bar, after they separately attended the President's Ball. AC ¶ 125, Afterwards, the two walked back to Plaintiff's off-campus residence where they talked, kissed, undressed themselves and had consensual sex. AC ¶ 126. Jane Roe slept over and Plaintiff drove her home the next morning. AC ¶ 127. Jane Roe and Plaintiff subsequently exchanged friendly text messages and, about one week later, they once again engaged in consensual sexual activity at Plaintiff's off-campus residence. AC ¶ 128.

On October 11, 2017, Plaintiff told Jane Roe he no longer wanted to pursue a romantic or sexual relationship with her. AC ¶ 129. During the time period in which Jane Roe and Plaintiff had been engaging in consensual, sexual activities there was extreme tension between Jane Roe and

her roommates because Plaintiff had expressed romantic interest in Jane Roe's roommate. AC ¶ 185.

On or about November 28, 2017, one of Jane Roe's friends, "G.C." verbally attacked Plaintiff after seeing him with G.C.'s ex-girlfriend. AC ¶ 130. G.C. said that Plaintiff "should be in jail for what he did to [Jane] Roe." *Id.* Plaintiff was extremely confused by this statement as he was unaware of Jane Roe—or anyone else—accusing him of improper behavior. *Id.*

On November 29, 2017, Plaintiff texted Jane Roe, who became enraged with Plaintiff for rejecting her and becoming involved with another woman. AC ¶¶ 131-133. For the first time, she accused Plaintiff of "not asking for consent" during their sexual encounter and then warned, "Next time you… have the audacity to say that you don't know if you'd ever be able to reciprocate feelings and act like you're doing a fucking favor by breaking things off, and then turn around and start dating the girl you were playing her off…you should think twice about the long term implications that may have for you." AC ¶ 132. Plaintiff told Jane Roe "I explicitly remember all of our conversations and if you feel that I wronged you in some other way [I'm] sure it was entirely a misunderstanding." AC ¶ 133.

On December 6, 2017, Jane Roe made a report against Plaintiff at Public Safety, alleging that she was sexually assaulted. AC ¶ 135. Public Safety did not immediately report the allegations to the Title IX Coordinator as required by the 2017 Sexual Misconduct Policy. AC ¶ 136. The Fairfield Police Department was immediately notified and two detectives sat in on Public Safety Officer Pat Jacquot's ("Officer Jacquot") interview with Jane Roe. *Id.* Jane Roe's account of what happened contained a number of inconsistencies that were never questioned. AC ¶¶ 182-183. Jane Roe requested that Plaintiff be interviewed last and "at least one day after" she submitted her written statement, which Officer Jacquot obliged. Am. Comp. ¶ 137.

4

The witness interviews conducted by Public Safety significantly contradicted the account that Jane Roe provided to Public Safety and suggested that Jane Roe had motive to make false accusations against Plaintiff. AC ¶¶ 138-143, 184-185. Jane Roe was never questioned about these issues. AC ¶ 185.

On December 11, 2017, with little advance notice, Officer Jacquot called Plaintiff and asked him to come over to the Public Safety office. AC ¶ 144. Jacquot did not inform Plaintiff of his right to bring an attorney, or even an advisor, even though Plaintiff was going to be interviewed and a sworn statement taken from him. AC ¶¶ 144-147. When Plaintiff arrived at Public Safety, Officer Jacquot failed to advise Plaintiff of his right to counsel or his Fifth Amendment rights. AC ¶ 148. During his interview, Plaintiff provided numerous details about his relationship with Jane Roe, and the precise manner in which they engaged in sexual activity on September 29, 2017. AC ¶¶ 148-151.

Public Safety issued no contact orders to Plaintiff in Jane Roe, which was not authorized by any University policy. AC ¶ 152. Public Safety also issued a no contact order to Plaintiff's roommate which prohibited him from contacting Jane Roe. AC ¶ 153. Public Safety *did not* issue a no contact order to Jane Roe's friend G.C. who had admittedly harassed and threatened Plaintiff. AC ¶ 154.

A proper Title IX investigation was never conducted in Plaintiff's case—whether under the 2017 Sexual Misconduct Policy or the 2018 Sexual Misconduct Policy. AC ¶¶ 155-181. On January 23, 2018, Brown, the University's Title IX Compliance Coordinator, sent a letter to Plaintiff informing him that she had appointed Officer Jacquot as Title IX investigator. This appointment could only have occurred under the 2018 Sexual Misconduct Policy otherwise it violated the 2017 Sexual Misconduct Policy which named a specific individual as Title IX

investigator. AC ¶¶ 155-163. Officer Jacquot was potentially biased against Plaintiff, as the male accused, because Public Safety had publicly avowed the necessity of better educating male students about sexual assault and holding them accountable, he was trained to adopt a trauma-informed approach, and his role as an officer caused him to take an adversarial position against the male accused. AC ¶ 163. Beyond the statements taken by Public Safety in December 2017, no further investigation was conducted. Defs. Ex. C.

On January 23, 2018, Brown sent a second letter to Plaintiff, informing him that she was in possession of an "investigation report" and that the matter was being referred to the University's disciplinary process. AC ¶¶ 164-165. In fact, Brown relied only on the statements taken by Public Safety. Defs. Ex. C. The form of investigation report required by the 2018 Sexual Misconduct Policy was never created. Plaintiff was given no opportunity to review and submit written comments about the report that Brown had in her possession. AC ¶¶ 167-169. Brown directed Plaintiff to schedule a meeting with Donoghue, the Dean of Students, which was highly prejudicial since Donoghue would be responsible for determining the sanctions against him. Donoghue had also publicly positioned herself as an advocate for female sexual assault complainants, as opposed to an impartial student conduct administrator. AC ¶¶ 170-171. Both Brown and Donoghue took actions that were outside the scope of any policy, and denied Plaintiff procedural protections that were provided for in the 2018 Sexual Misconduct Policy. AC ¶¶ 172-181.

Plaintiff's first hearing took place on February 9, 2018. AC ¶ 189. Prior to the first hearing, Jane Roe produced text messages with her friends which were heavily redacted, except for select entries which she believed supported her case. AC ¶ 186. Plaintiff objected but Fairfield declined to take action and either exclude the evidence or require Jane Roe to produce unredacted copies. AC ¶¶ 186-187. Prior to the first hearing, Jane Roe produced medical records from the campus

health clinic which contradicted her account to Public Safety that she told a medical provider that she was sexually assaulted. Per the records, Jane Roe later returned to the clinic and requested that the records be changed to comport with her narrative. AC ¶¶ 187-188.

At the first hearing, *only because of a comment made by Jane Roe*, Plaintiff learned that Brown permitted hearing board member Colby Lemieux to participate in the proceedings even though Brown was aware that Lemieux and Jane Roe had a close relationship. AC ¶ 191. A number of procedural errors also occurred, which astounded Plaintiff's advisor, Brian Walker ("Walker"), a Fairfield professor. AC ¶ 201. Walker sent a letter to Brown, Donoghue and President Mark Nemec ("President Nemec") setting forth the numerous procedural errors, policy deviations and conflicts of interests which tainted the hearing process. AC ¶¶ 201-202.

In response to Walker's letter, Donoghue "nullified" the first hearing and referred the matter to Brown. Brown ordered a second hearing. These actions were not authorized by any policy. AC ¶¶ 204-206. Because Brown failed to conduct an investigation in compliance with the University's sexual misconduct policies, the second hearing board was deprived of information it normally would have had, including a written investigation report with the required analysis, and the party's responses to the same. AC ¶¶ 209-210. Brown also provided prejudicial information to the hearing board. AC ¶ 211. Again, Brown permitted Jane Roe to rely on her redacted text messages, over Plaintiff's objection. AC ¶ 212. Significantly, Jane Roe was not required to submit her damaging medical records to the second hearing board. AC ¶ 213. Brown ran the second hearing pursuant to set of procedures that were violative of the 2018 Sexual Misconduct Policy. AC ¶ 214.

The second hearing was held on March 9, 2018. AC ¶ 208. Brown permitted Jane Roe to commandeer the hearing, threaten Plaintiff's life and threaten litigation against the University if it

did not punish Plaintiff, all in front of the hearing board. AC ¶¶ 215-220. The board appeared to be afraid of Jane Roe and avoided questioning her about the numerous inconsistencies in her prior statements. AC ¶ 217. The hearing board found Plaintiff responsible for non-consensual sexual intercourse even though the evidence supported Plaintiff's account of what happened. AC ¶ 220. A "deferred dismissal" was imposed, but Plaintiff was permitted to complete his classes remotely. AC ¶ 223. The "deferred dismissal" is permanently marked on Plaintiff's transcript. AC ¶ 224.

Plaintiff, who suffers from ADHD, requested an accommodation so that he could attend his labs and certain classes in person during the "deferred dismissal" period. AC ¶¶ 225-230. This request was properly submitted and supported by documentation from Plaintiff's physicians. It was also backed by Plaintiff's professors. *Id.* Jane Roe was completing her course work remotely and they shared no classes together. AC ¶ 229. Brown told Plaintiff that he would be accommodated. AC ¶ 228. Donoghue reversed this decision. *Id.*

On March 14, 2018, Plaintiff filed eight formal complaints against Jane Roe, for retaliation and creating a hostile environment. AC ¶ 244. Brown and Donoghue disregarded these complaints, glossed over the seriousness of Jane Roe's actions towards Plaintiff and took no action to investigate. Rather, Donoghue required Plaintiff to come forward with evidence to support his claims even though the evidence already in the University's possession supported his allegations. AC ¶¶ 244-250.

Plaintiff's appeal of the finding and sanction were reviewed by President Nemec, who had clear conflicts of interest. AC ¶ 231-243. Nemec applied the wrong standard to the appeal and then denied Plaintiff's appeal. AC ¶¶ 243.

Each University official involved in the investigation and adjudication process acted in a manner that was indicative of gender bias. AC ¶¶ 264-278.

**ARGUMENT**

**I.      The Applicable Legal Standard**

As stated by the Court in *Burhans v. Yale University*, No. 3:12cv1462, 2014 WL

12758391, at *1 (D. Conn. 2014) (Eginton, J.):

> The function of a motion to dismiss is "merely to assess the legal feasibility of the
> complaint, not to assay the weight of the evidence which might be offered in support
> thereof….When deciding a motion to dismiss for failure to state a claim, the Court must
> accept all well-pleaded allegations as true and draw all reasonable inferences in favor of
> the pleader…. The complaint must contain the grounds upon which the claim rests through
> factual allegations sufficient "to raise a right to relief above the speculative level….A
> plaintiff is obliged to amplify a claim with some factual allegations to allow the court to
> draw the reasonable inference that the defendant is liable for the alleged conduct. A
> plaintiff must plead facts sufficient to show that her claim has substantive plausibility but
> a complaint should not be dismissed due to an "imperfect statement of the legal theory
> supporting the claim asserted. (citations omitted).

Plaintiff's Amended Complaint more than adequately satisfies this pleading standard.

**II.     Plaintiff Alleged A Plausible Title IX Selective Enforcement Claim**

Defendants assert that Plaintiff's Title IX selective enforcement claim (Count II of the

Amended Complaint) should be dismissed because Plaintiff cannot rely on i) made "upon

information and belief" to support his claim and ii) Jane Roe is not a reasonable comparator. The

Court should reject these meritless arguments and allow Plaintiff's selective enforcement claim to

proceed to discovery.

**A.  Allegations Made "Upon Information And Belief" Satisfy *Iqbal/Twombly***

Defendants' assertion that Plaintiff's selective enforcement claim should be dismissed

because he made allegations supporting his claim "upon information and belief" should be rejected

and the Court should allow the claim to proceed to discovery. *See* Moving Br. at 10-11; AC ¶¶

281.[3]

---

[3] In electing not to move for dismissal of Plaintiff's Title IX erroneous outcome claim, Defendants concede that
Plaintiff has adequately alleged that gender bias influenced Fairfield's decision to discipline Plaintiff. *See Yusuf v.*

None of the cases cited by Defendants hold that allegations in support of a selective enforcement claim *cannot* be alleged upon information and belief. In *Yusuf*, 35 F.3d at 716, the plaintiff made no allegations concerning a female comparator. In *Rolph v. Hobart & William Smith Colleges*, 271 F. Supp. 3d 386, 401 (W.D.N.Y. 2017), the complaint plainly stated that "women rarely, if ever, are accused of sexual harassment" which the Court found contradicted any allegation that the defendant engaged in selective enforcement. *Id.* Similarly, in *Prasad v. Cornell University*, 2016 WL 3212079, at *18 (N.D.N.Y. Feb. 24, 2016), the plaintiff alleged that "there are no reported incidents of male complainants against female students for sexual assaults and/or there are no reports of female accused students being disciplined for sexual misconduct against male complainants." *Id.* Here, there are no such allegations.

In *Christian v. Town of Riga*, 649 F. Supp. 2d 84, 94 (W.D.N.Y. 2009), no Title IX claim was alleged. The case involved the selective enforcement of land use restrictions and the plaintiff alleged only one sentence in the complaint that provided no details about the alleged manner in which a comparator was treated differently than the plaintiff.

Similarly, *Albert v. Carovano*, 851 F.2d 561 (2d Cir. 1988), did not concern Title IX. With respect to the plaintiffs' Section 1981 claim, the court found that the complaint's allegations contradicted any claim of selective enforcement based on the plaintiffs' race. It was also uncontested that the plaintiffs, who had been disciplined for occupying a campus building as part of a protest, refused to leave the building at the request of college officials and were aware that their failure to leave would result in discipline. *Id.* at 573. The court *did not* discredit the allegations

---

*Vassar College*, 35 F.3d 709, 715-716 (2d Cir. 1994); AC ¶¶ 258, 264-278. Thus, the only issue raised by Defendants with respect to Plaintiff's selective enforcement claim is whether the existence of a female comparator(s) was sufficiently alleged. *See* Moving Br. at 8-11.

averred upon information and belief. *Id.* In *Albert*, the court made clear that "we do not mean that exactly, rather than reasonably comparable cases must be alleged." *Id.*[4]

Here, Plaintiff's allegations are anything but conclusory. Rather, Plaintiff outlines the basis for his allegation that the University treated female students accused of sexual misconduct more favorably and/or enacted more severe penalties on male students. In Paragraphs 28-65 of the Amended Complaint, Plaintiff details the intense pressure that federal, state and local officials exerted on Fairfield to crack down on male students. Fairfield administrators publicly announced that the University would be specifically targeting male students in its education and prevention efforts so that female students would be protected from sexual assault. AC ¶¶ 58-65. The University also sought to hold male students accountable and offered segregated education programs to male and female students. *Id.* Male students reported feeling that the University's approach towards them was "combative" and "vindictive." AC ¶ 65. Plaintiff then alleges, at Paragraph 281 of the Amended Complaint:

> Fairfield also engaged in selective enforcement because, upon information and belief, as compared to the number of female students accused of sexual misconduct, the number of male students whose cases are formally investigated and adjudicated is greater. Upon information and belief, since at least January 1, 2014, reports of sexual misconduct against female students have not been formally investigated or referred to disciplinary hearings. To the extent that any female accused were subjected to disciplinary hearings, and found responsible, the sanctions issued were far less severe than those issued to comparable male respondents. These allegations are alleged upon information and belief because Plaintiff was unable to locate any data relating to the gender of students accused of sexual misconduct who were formally investigated, found responsible and received sanctions…. However, as alleged by Plaintiff *supra* Paragraphs 28-65, beginning in 2014, Fairfield engaged in a Title IX compliance strategy which targeted male students and sought more severe discipline against them. This is supported by anecdotal evidence.

---

[4] Defendants also mischaracterized *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648 (1999) as the "backdrop against which selective enforcement claims are evaluated." Moving Br. at 9. *Davis* addressed whether a school was deliberately indifferent to the plaintiff's, and other students, complaints that another student was engaging in misconduct. No selective enforcement claim was alleged. The court *did not* defer to the school's decision but, instead, held that it "remain[ed] to be seen whether petitioner can show that the Board's response to reports of G.F.'s misconduct was clearly unreasonable in light of the known circumstances." 526 U.S. at 648.

While Defendants baldly assert that Plaintiff's claim is not viable because he averred allegations "upon information and belief," Moving Br. at 9-11, the Second Circuit has held that the "*Twombly* plausibility standard…does not prevent a plaintiff from 'pleading facts alleged 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120-121 (2d Cir. 2010) (citation omitted).

A number of courts have allowed Title IX claims to proceed to discovery where information concerning sexual misconduct proceedings, including the gender of the respondents, is exclusively in the possession of a college or university. *See Doe v. The Trustees of the U. of Penn.*, 270 F. Supp. 3d 799, 824 (E.D. Pa. 2017) (selective enforcement claim could proceed to discovery where complaint alleged that comparator information was in exclusive possession of university); *Doe v. Brown U.*, 166 F. Supp. 3d 177, 189 (D.R.I. 2016) ("Requiring that a male student conclusively demonstrate, at the pleading stage, with statistical evidence and/or data analysis that female students accused of sexual assault were treated differently, is both practically impossible and inconsistent with the standard used in other discrimination contexts"); *Ritter v. Oklahoma City U.*, 2016 WL 3982554 at **2-3 (W.D. Okla. July 22, 2016) (allegations of gender bias pled on information and belief met *Twombly* standard).

In a strained effort to avoid acknowledging the relevance of its Title IX data to Plaintiff's erroneous outcome and selective enforcement claims, Defendants contend that said data relates to an impermissible disparate impact claim. Moving Br. at 11. Yet, whether or not Fairfield took a different, more favorable approach to female students accused of and/or found responsible for sexual misconduct is relevant to whether Fairfield engaged in a pattern of decision making which

demonstrates gender bias (for purposes of Plaintiff's erroneous outcome claim),[5] or engaged in selective enforcement by investigating, disciplining and/or more severely disciplining male students accused of sexual misconduct (for purposes of Plaintiff's selective enforcement claim). *See, e.g., Trustees of the U. of Penn.*, 270 F. Supp. 3d at 824 (information concerning the outcome of Title IX disciplinary proceedings was "critical information that would support a Title IX claim based on a selective enforcement theory"); *Prasad*, 2016 WL 3212079 at ** 16-17 (finding that, after conducting discovery plaintiff, could produce statistical evidence supporting his claim that gender influenced the outcome of his disciplinary proceeding).

**B.**     **Jane Roe Is A Reasonable Comparator**

The Court should also reject Defendants' assertion that Jane Roe is not an appropriate comparator for purposes of Plaintiff's selective enforcement claim. *See* Moving Br. at 9-10. Plaintiff alleged the following as to Jane Roe:

> On March 14, 2018, Plaintiff filed eight (8) formal complaints against Jane Roe, for retaliation and creating a hostile environment, based on:
>
> i)     Jane Roe's repeated, public references to John Doe as a rapist to University personnel and students;
>
> ii)    Jane Roe requesting that a University employee alter her medical records to conform to her allegations against John Doe;
>
> iii)   Jane Roe soliciting strangers to approach John Doe at a private business and accuse him of rape;
>
> iv)    G.C.'s public statements and harassment against John Doe;
>
> v)     Jane Roe's failure to disclose her relationship with Lemieux in order to gain an advantage at the hearing;

---

[5] Indeed, Defendants have *not* moved to dismiss Plaintiff's erroneous outcome claim. Plaintiff will seek the same statistical data in discovery as relevant to his erroneous outcome claim as he would in regard to selective enforcement. Accordingly, allowing the selective enforcement claim to proceed to discovery would not be prejudicial to Defendants. *See, e.g., Trustees of U. of Penn.*, 270 F. Supp. 3d at 824 (denying motion to dismiss selective enforcement claim, because court was already permitting plaintiff to proceed to discovery on erroneous outcome claim).

      vi)     Jane Roe's violation of the no contact order by reaching out to John Doe's housemates in person and by text message and threatening John Doe;

      vii)    Jane Roe's violation of the duty of honesty by lying to the second hearing board;

      viii)   Jane Roe's intimidation tactics at the second hearing when she threatened John Doe's life.

AC ¶ 244. These actions, as alleged, constituted a violation of the University Non-Discrimination and Harassment Policy, which prohibited discrimination or retaliation against students who "participated in any process designed to address and/or resolve an allegation of discrimination." AC ¶ 84.

These actions, as alleged, also violated the 2018 Sexual Misconduct Policy, which defined "Retaliation" as including "abuse or violence, other forms of harassment, and/or making false statements about another person in print or verbally with intent to harm their reputation…. Retaliation…constitutes a serious violation of this policy." AC ¶ 110. Per the 2018 Sexual Misconduct Policy, "The University will not tolerate retaliation in any form against persons for their participation or involvement in the … resolution of matters reported or subject to the Sexual Misconduct Policy…. The University includes retaliation in its definition of prohibited conduct under this Policy." *Id.* ¶ 122.

Per the Amended Complaint, Jane Roe and John Doe each alleged that the other engaged in prohibited conduct under Fairfield's sexual misconduct policies. Jane Roe's allegations were immediately investigated, while John Doe's allegations were immediately discredited and the burden was placed on him to provide evidence to the University which supported his allegations. *Compare* AC ¶¶ 135-154 *with* AC ¶¶ 244-250. *See Albert*, 851 F.2d at 573 (reasonable rather than exact comparator must be alleged). *See also Brown U.*, 166 F. Supp. 3d at 189 (finding that female

student that plaintiff accused of sexual misconduct was sufficient comparator even though she accused plaintiff of sexual misconduct with respect to a third person).

For all of the above-stated reasons, the Court should deny Defendants' motion to dismiss with respect to Plaintiff's Title IX selective enforcement claim.

## III. The Connecticut Supreme Court's *Gupta* Decision Does Not Preclude Plaintiff's State Law Claims

Defendants erroneously contend that Plaintiff's claims for breach of contract (Count II), breach of the implied covenant of good faith and fair dealing (Count III) and negligent infliction of emotional distress (Count V) should be dismissed because they are based on the University's failure to properly "conduct the investigation and disciplinary proceedings" and this "amounts to nothing more than an educational malpractice challenge…precluded by Connecticut law." Moving Br. at 11.

Defendants ground this argument in Plaintiff's purported failure to allege i) that Fairfield engaged in arbitrary, capricious, or bad faith conduct; and ii) a claim that falls within one of the exceptions set forth in *Gupta*. Defendants also contend that Plaintiff's claim for negligent infliction of emotional distress is precluded under *Gupta*. As fully set forth below, Plaintiff's state law claims are not precluded by Connecticut law.

### A. The Amended Complaint Is Replete With Allegations of Fairfield's Arbitrary, Capricious and Bad Faith Conduct

Defendants argue that the University's decision to sanction Plaintiff should be accorded deference by the Court because the Amended Complaint lacks any plausible allegations of arbitrary, capricious or bad faith conduct. Defendants deliberately mischaracterize the numerous allegations of the Amended Complaint as merely reflecting Plaintiff's disagreement with the outcome of the Title IX disciplinary proceedings. Moving Br. at 14-15. Because the Amended

Complaint is replete with plausible allegations that the University acted in a manner that was arbitrary, capricious and exhibited bad faith, the Court should reject Defendants' unsupported argument and allow Plaintiff's state law claims to proceed to discovery.

As set forth by the Connecticut Supreme Court in *Gupta*, "[e]ducational discretion is…not limitless…in exercising professional judgment, an educational institution does not have license to act arbitrarily, capriciously, or in bad faith. Such substantial departures from academic norms…may constitute the breach of an educational contract by a private institution." *Id.* at 595. Whether or not an educational institution acted in a manner that was arbitrary, capricious, or in bad faith is a matter that is not typically decided at the motion to dismiss stage. *See Gupta*, 239 Conn. at 575 (setting forth burden of proof at the summary judgment stage). *See also Bass v. Miss Porter's School*, 738 F. Supp. 2d 307, 327 (D. Conn. 2010) (evaluating breach of contract and tort claims at summary judgment stage); *Jacobs v. Ethel Walker School Inc.*, 2003 WL 22390051 at **6-7 (Conn. Super. Ct. Sept. 30, 2003) (denying summary judgment on plaintiff's breach of contract and breach of implied covenant claims where there were genuine issues of material fact concerning whether school acted arbitrarily, capriciously or in bad faith). The standard then employed by the courts is whether a university's decision had "no discernible rational basis." *Gupta*, 239 Conn. at 575.[6] Even at the pleading stage, Plaintiff's allegations pass muster.

Plaintiff plausibly alleges that the manner in which Fairfield investigated and adjudicated Jane Roe's sexual misconduct allegations was arbitrary, capricious and/or evidenced bad faith because:

(i)     Jane Roe's report of sexual assault was devoid of credibility, as the details of her sexual interaction with John Doe changed each time she told her story. Yet Jane

---

[6] In one case cited by Defendants, *Mara v. McNamara*, 2015 WL 4392956, at * 10 (D. Conn. July 15, 2015), a case involving a Rule 12(b)(6) motion, the court applied the "no discernible rational basis" standard when evaluating the allegations set forth in the complaint. However, the court allowed the plaintiff's claims—premised on Fairfield's "arbitrary and capricious" decision to discipline him—to proceed to discovery.

Roe's account was credited over John Doe's. AC ¶¶ 182-188, 299.

(ii)   The University employed procedures that were not written in any of the University's applicable policies and, after the 2018 Sexual Misconduct Policy went into effect in January 2018, Fairfield administrators elected not to provide Plaintiff with a number of rights he should have been afforded under that Policy. AC ¶¶ 135-181, 189-224.

(iii)  Unbeknownst to Plaintiff, and discovered by him during the first hearing, the University employed hearing board members with known biases and conflicts of interest to conduct the first hearing. AC ¶¶ 189-202. Rather than simply reversing and vacating the board's biased finding, the Title IX Compliance Coordinator "nullified" the first hearing and ordered an unauthorized second hearing. AC ¶¶ 203-207. The first hearing was so rife with bias, and errors, that Plaintiff's advisor—a Fairfield professor—sent a letter to the relevant administrators, and President Nemec, declaring the outrageousness of what had happened during the hearing. AC ¶¶ 201-202.

(iv)   The Title IX Compliance Coordinator elected to apply the 2018 Sexual Misconduct Policy to the second hearing. AC ¶ 206. Yet the information that was supposed to be compiled for the second hearing board under the 2018 Sexual Misconduct Policy—such as a comprehensive investigation report—was neither compiled nor provided to the second hearing board. AC ¶¶ 209-210.

(v)    The first hearing board was provided Jane Roe's medical records, which she sought to have altered to include allegations of sexual assault. The medical records in fact showed that Jane Roe was okay with the complained of sexual encounter with Plaintiff. Jane Roe was *not* required to submit the same evidence to the second hearing board. AC ¶ 213.

(vi)   The Title IX Compliance Coordinator permitted Jane Roe to submit redacted text messages to the second hearing board even though Plaintiff raised concerns about Jane Roe altering those messages to build "evidence" against him. AC ¶ 212.

(vii)  The Title IX Coordinator allowed Jane Roe to commandeer the second hearing by calling John Doe a rapist, threatening his life, threatening litigation against Fairfield and allowing her to run out of the room when Plaintiff's witness testified. AC ¶¶ 215-218. As a result, the second hearing board was visibly uncomfortable and failed to ask Jane Roe questions concerning her credibility—such as why she made numerous inconsistent statements about the details of her sexual encounter with Plaintiff. AC ¶ 217.

(viii) The actions of the individuals involved in the investigation and adjudication of Jane Roe's allegations demonstrated gender bias against Plaintiff. AC ¶¶ 265-278.[7] The

---

[7] Notably, Defendants have not moved to dismiss Plaintiff's Title IX erroneous outcome claim and do not dispute that Plaintiff has plausibly alleged that gender bias was a motivating factor in the decision to discipline Plaintiff.

second hearing board, like the first, was also trained in a trauma-informed manner that caused them not to question the credibility of female complainants. AC ¶ 208.

(ix)     Fairfield's actions in Plaintiff's case were undertaken with a dishonest purpose because they were intended to: design a process that favored Jane Roe and the University over Plaintiff; deprived Plaintiff of his fundamental rights; punish Plaintiff despite a lack of credible evidence' and maintain Fairfield's legislative data and reputation as advocating for female complainants. AC ¶¶ 310-311.

Defendants simply ignored this wealth of allegations in arguing that Plaintiff failed to allege any arbitrary, capricious and bad faith conduct. Under *Gupta*, engaging in such conduct, alone, would constitute a breach of Fairfield's disciplinary policies because implicit in every contract is "a promise not to act capriciously or arbitrarily." 239 Conn. at 595.

The confused amalgam of case law Defendants cite in support of their argument does not support the dismissal of Plaintiff's state law claims:

*Gupta*, a *summary judgment* decision, involved "academic decisions concerning medical competency" which the court found "particularly warranted judicial circumspection." The court also found that the plaintiff failed to adduce evidence to support his claim of arbitrary, capricious or bad faith conduct. 239 Conn. at 597-598.

In *Jacobs*, 2003 WL 22390051, at *6, also a *summary judgment* decision, the court found that there were genuine issues of material fact as to whether a private high school conducted disciplinary proceedings against a student in a manner that was arbitrary and capricious. The court interpreted the "educational malpractice" claim as a breach of contract claim because the plaintiffs "alleged that the defendants have violated specific contractual obligations to conduct the disciplinary process in accordance with the procedures set forth in the…Handbook." *Id.* at *5. The court also permitted the plaintiffs' claims for breach of the implied covenant of good faith and fair dealing and negligent infliction of emotional distress to proceed. *Id.* at *6.

In *Bass*, 738 F. Supp. 2d at 331, also a summary judgment opinion, no arbitrary or capricious conduct was found with respect to the defendant-private school's expulsion of the plaintiff because the plaintiff *admitted to* violating the school's alcohol policy and, pursuant to the school's handbook, the violation warranted expulsion. Here, Plaintiff made no such admission. On the contrary, Plaintiff credibly and consistently denied that he violated University policy. AC ¶¶ 144-151.

In *Mara*, 2015 WL 4392956 at *10, the court denied Fairfield's motion to dismiss a wrongful discipline claim because the plaintiff plausibly alleged that the University's decision was arbitrary and capricious. While the plaintiff in *Mara* alleged that he was disciplined after he was found not responsible for committing an assault, here John Doe, has alleged that the evidence gathered in support of Jane Roe's allegations—including her own statements—utterly contradicted the finding of responsibility for sexual misconduct such that he should not have been found responsible or disciplined. AC ¶¶ 182-185.

For the above stated reasons, Plaintiff has plausibly alleged that Fairfield engaged in arbitrary, capricious and/or bad faith conduct when investigating and adjudicating Jane Roe's Title IX complaint and disciplining Plaintiff and his state law claims should not be dismissed.

**B.  <u>Plaintiff Alleged A Plausible Breach of Contract Claim</u>**

Defendants argue that Plaintiff's breach of contract claim should be dismissed because it does not fall within one of two exceptions set forth in *Gupta*, pursuant to which the Connecticut Supreme Court would allow a breach of contract claim against an educational institution to proceed. Moving Br. at 12-15. On the contrary, Plaintiff's breach of contract claim falls within the

second exception, where an "educational institution failed to fulfill a specific contractual promise distinct from any overall obligation to offer a reasonable program." *Gupta*, 239 Conn. at 593.[8]

It is well established that the basic legal relation between a student and a private university is contractual in nature. *Johnson v. Schmitz*, 119 F. Supp. 2d 90, 93 (D. Conn. 2000); *Burns v. Quinnipiac U.*, 120 Conn. App. 311, 320-321 (Conn. App. Ct. 2010). "'[C]atalogues, bulletins, circulars, and regulations of the institution' determine the contractual relationship between the student and the educational institution.'" *Johnson*, 119 F. Supp. 2d at 93 (citation omitted). "Because a student bases his or her decision to attend a college or university, in significant part, on the documents received concerning core matters…application of contract principles based on these documents and other express or implied promises, consistent with the limitations expressed in *Gupta*…appears sound." *Johnson*, 119 F. Supp. 2d at 93.[9] The "interpretation of the written terms of a contract and the degree of compliance by the parties are questions of fact to be determined by the trier of fact." *Burns*, 120 Conn. 320 (citation omitted).

Allegations that a university failed to address misconduct in accordance with its own procedures fall within *Gupta's* second exception. *Johnson*, 119 F. Supp. 2d at 96 (denying Yale's motion to dismiss breach of contract claim). As stated in *Johnson*:

> [Plaintiff] claims that Yale failed to deliver on its express and implied contractual duties to safeguard students from academic misconduct, to investigate and deal with charges of academic misconduct, and to address charges of academic misconduct in

---

[8] Defendants misinterpret *Faigel v. Fairfield University*, 75 Conn. App. 37, 38 (Conn. App. 2003), as imposing an additional requirement of a "special promise" when alleging a breach of contract claim against an educational institution that falls within the second *Gupta* exception. This is not the case. The *Faigel* court was merely reiterating *Gupta's* requirement that courts accord deference to educational institutions, unless a case falls within the two exceptions, including a failure to fulfill a specific, contractual promise. *See id. Faigel*, a summary judgment opinion, concerned Fairfield's alleged promise to the plaintiff that she would be allowed to us "many credits" from her prior engineering studies which the court found to be non-specific. *Id.* at 43.

[9] The cases cited by Defendants at page 16 of their Moving Brief are inapposite as they do not concern contracts between students and educational institutions. *Hawley Avenue Assocs. LLC v. Robert D. Russo, M.D. & Assocs. Radiology, P.C.*, 130 Conn. App. 823, 832 (2011) (appeal regarding breach of lease after trial of landlord/tenant dispute); *Reynolds v. Chrysler First Commercial Corp.*, 40 Conn. App. 725, 730 (1996) (appeal of summary judgment decision concerning existence of employment contract).

accordance with its own procedures….These alleged promises are based on Yale's own representations and procedures related to conduct peripheral or ancillary to the central education process. Thus they do not implicate the jurisprudential considerations associated with the rejected tort of educational malpractice, as the Court or fact finder will not be required to evaluate subjective aspects of the quality of Yale's graduate academic program…but instead will determine whether or not Yale had a contractual duty…and…whether that duty was breached in [Plaintiff's] case…. [T]he Court recognizes that it may be required to evaluate the adequacy of policies designed to prevent misconduct; however, this factor is capable of objective assessment. Indeed, courts regularly engage in analogous inquiry, when, in resolving workplace sexual harassment cases, they evaluate an employer's affirmative defense that it had effective procedures in place to prevent the harassment.

*Id. See also Doe v. Quinnipiac U.*, 2019 WL 3003830, at **17-21 (July 10, 2019) (Arterton, J.) (denying summary judgment on claims that university breached student handbook and policies twenty-nine different ways); *Bass*, 738 F. Supp. 2d at 321-322 (denying motion for summary judgment on portion of breach of contract claim alleging that school breached handbook provision concerning disclosure of student disciplinary information to third parties); *Morris v. Yale U.*, 2006 WL 908155 at *5 (D. Conn. April 4, 2006) (denying motion to dismiss plaintiff's breach of contract claim alleging breach of student handbook provision); *Osberg v. Yale U.*, 2009 WL 659072 at **3-4 (Conn. Sup. Ct. Feb. 11, 2009) (denying motion to strike breach of contract claim grounded in allegation that university failed to follow procedure outlined in bulletin) *Jacobs*, 2003 WL 22390051 at **5-6 (denying summary judgment on breach of contract claim alleging that manner in which private school conducted disciplinary process violated the school's handbook). In this context, a court may focus on "those claimed breaches going to [a university's] alleged denial of the process reasonably relied on by [the] Plaintiff, based on [the university's] own policies and procedures." *Quinnipiac U.*, Doc. No. 152, at p. 34.

In the Amended Complaint, Plaintiff alleges a number of specific promises that are set forth in Fairfield's various anti-discrimination and sexual misconduct policies and the manner in which Fairfield breached those policies:

- **<u>Fairfield Engaged in Sex Discrimination Against Plaintiff</u>**: At Paragraph 289 of the Amended Complaint, Plaintiff alleges that Fairfield's 2017 Sexual Misconduct Policy stated that "Fairfield…does not discriminate on the basis of sex…in the administration of educational policies." Plaintiff then cites to the allegations of the Amended Complaint which support his plausible claim of gender bias (which Defendants have not moved to dismiss). At Paragraph 297 of the Amended Complaint, Plaintiff makes the same allegation with respect to the 2018 Sexual Misconduct Policy. *See* Defs. Ex. B, at p 3. *See Doe v. Amherst College*, 238 F. Supp. 3d 195, 218 (D. Mass. 2017) (denying summary judgment on breach of contract claim where specific factual allegations were provided from which the court could infer that disciplinary proceeding was conducted in discriminatory manner in violation of college policy). *See also Quinnipiac*, 2019 WL 3003830, at * 18 (allegation that university violated handbook by failing to comply with Title IX supported breach of contract claim).

Defendants' reliance on *Byra-Grzegorzyck v. Bristol-Meyers Squibb Co.*, 572 F. Supp. 2d 233, 254 (D. Conn. 2008), a summary judgment opinion, is misplaced as the court's holding was limited to employer personnel manuals and involved public policy considerations that are not present here. The language at issue in *Gally v. Columbia U.*, 22 F. Supp. 2d 199, 208 (S.D.N.Y. 1998), also a summary judgment opinion, was far more general than the language here, simply stating that "all students should receive fair and equal treatment." In addition, the plaintiff failed to allege facts that the purported promise was breached. *Id.* Similarly, in *Goodman v. President & Trustees of Bowdoin College*, 135 F. Supp. 2d 40, 56 (D. Me. 2001), the handbook at issue merely stated that "Discrimination…has no place in an intellectual community." Likewise, in *Ruegsegger v. Bd. of Regents of Western N. Mexico U.*, 154 P.3d 681, 688 (N.M. App. 2006), the court evaluated a general statement concerning the university's "commitment to maintaining an environment free of sexual discrimination." In contrast, Fairfield's policies expressly state that the University will not discriminate in the administration of its policies.

- **<u>Public Safety Failed to Immediately Notify the Title IX Coordinator</u>**: Per the 2017 Sexual Misconduct Policy, "[w]henever the Department of Public Safety receives a report of sexual misconduct… the Department of Public Safety will notify the Title IX Compliance Coordinator/Investigator of the reported incident." Am. Comp. ¶¶ 89, 290. Defs. Ex. A, at p. 67. The 2017 Sexual Misconduct Policy further states that "when an act of sexual misconduct is reported to Public Safety, the matter will be referred to the Title IX Compliance Coordinator/Investigator." Defs. Ex. A, at p. 67. The Policy lists the Title IX Compliance Investigator as "William Johnson." *Id. See* AC ¶ 91. The Title IX Compliance Coordinator/Investigator is then tasked with conducting "a prompt, thorough and impartial investigation." AC ¶ 26. *See* Defs. Ex. A, at p. 71. It is undisputed that Public Safety undertook its own investigation without involving the appointed Title IX Investigator. *See generally* Defs. Ex. C. *See* AC ¶¶ 135-154. Brown, the Title IX Coordinator, "referred" the matter to Officer Jacquot on January 23, 2018, after the Public Safety investigation had already been conducted without William Johnson. AC ¶¶ 135-154, 161-165. On the same day, she referred the matter to the University's disciplinary process. *Id.*

  Defendants incorrectly assert that the language requiring referral of the matter to the Title IX Coordinator is not "promissory" in nature, and provides respondents with no rights, because it relates to Title IX complainants. Moving Br. at 17. On the contrary, the referral language appears in two sections: i) "Department of Public Safety" and ii) "Title IX Compliance Coordinator/Investigator." Defs. Ex. C at p. 67. While the sections concern the reporting of sexual misconduct complaints, they also inform those accused of sexual misconduct what the process will be once a complaint is reported and who will undertake any investigation. *See Quinnipiac*, 2019 WL3003830 at * 19 (alleged breach of handbook provisions requiring prompt reporting of sexual misconduct to Title IX Coordinator supported breach of contract claim).

- **<u>The University Did Not Conduct A Thorough And Impartial Investigation</u>**: The terms "thorough" and "impartial" are capable of definition and are not, as

Defendants' contend, "general and vague…and therefore inactionable." Moving Br. at p. 17. *See Quinnipiac*, 2019 WL3003830, at *19; *Amherst College*, 238 F. Supp. 3d at 217-218.

As defined in the Merriam Webster dictionary, "thorough" means "carried through to completion," "marked by full detail" and "careful about detail."[10] As alleged in the Amended Complaint, the investigation undertaken by Officer Jacquot—who was *not* the Title IX investigator named in the 2017 Sexual Misconduct Policy— was not thorough because Officer Jacquot "did not request evidence from John Doe, nor did he interview all of John Doe's witnesses." AC ¶ 291.

An "impartial" investigation is conducted without bias. As alleged in the Amended Complaint, the investigation conducted by Public Safety was not impartial because, among other things, Jane Roe and her witnesses were treated more favorably, John Doe's constitutional rights were deliberately violated and the actions of Officer Jacquot, and others, were indicative of gender bias. AC ¶¶ 135-154, 267-269, 291.

- **Fairfield Failed to Impose Reasonable Interim Measures**: Per the 2017 Sexual Misconduct Policy, Fairfield was required to impose "reasonable interim (pre-hearing) corrective actions." Whether the interim measures are reasonable is informed by additional language—"for the benefit of the complainant and accused" and "seeking to minimize the burden as much as is reasonably possible." AC ¶¶ 95, 292. *See* Defs. Ex. A, at p. 72. Plaintiff alleged that the interim measures imposed by the University were not reasonable because they severely restricted his access to campus even though he shared no classes or activities with Jane Roe. Am. Comp. ¶ 292.

The cases Defendants rely upon to argue that the language at issue does not identify an actionable promise are inapposite. Moving Br. at 18. None of them hold that a contractual promise to take action in a manner that is reasonable is unenforceable.

[10] https://www.merriam-webster.com/dictionary/thorough

24

- **<u>Fairfield Limited Plaintiff's Rights At the First Hearing</u>**: According to the 2017 Sexual Misconduct Policy "both the complainant and the accused are entitled to…present relevant statements and witnesses during a formal conduct proceeding. When the hearing is held, all appropriate steps will be taken to ensure both a full and fair examination. AC ¶ 293. Defs. Ex. A, at pp. 72-73. Plaintiff alleged that he was denied his right to present all relevant evidence at the hearing. AC ¶¶ 189-202, 293. Plaintiff further alleged that he was denied a fair examination of the evidence because two of the hearing board members were biased and were allowed to participate. This information was not disclosed to Plaintiff prior to the hearing. *Id.* Plaintiff also alleged that the hearing board members who presided over the first hearing lacked appropriate training as required by the 2017 Sexual Misconduct Policy. AC ¶ 294.

  Defendants discount Plaintiff's allegations by arguing that any "claims about the First Hearing fail because the second hearing negated any earlier alleged irregularities and did not produce an 'erroneous outcome.'" Moving Br. at 18. This argument concerns Plaintiff's Title IX claim, which Defendants did not move to dismiss.[11] It is undisputed that the University's policy violations in regard to the first hearing caused Plaintiff to suffer through a second hearing. At the second hearing, certain critical evidence shared with the first hearing board—namely Jane Roe's medical records—were not shared. It cannot simply be concluded at this stage of the action that the breaches of policy that occurred with respect to the first hearing caused no harm to Plaintiff or are simply irrelevant.

- **<u>Fairfield's Numerous Violations of the 2018 Policy</u>**: Plaintiff alleges that, as of January 1, 2018, Fairfield implemented the 2018 Sexual Misconduct Policy and that, as of January 23, 2018, Brown elected to proceed under that Policy, which she referenced by hyperlink in her correspondence with John Doe, and as evidenced by her election of "Officer Jacquot" as the Title IX investigator. AC ¶¶ 296-297. Plaintiff then

---

[11] *Doe v. Cummins,* 662 Fed. Appx. 437, 447 (6th Cir. 2016), addresses the very different question of whether the plaintiffs' first hearings could be considered as part of their due process claims. In *Young v. Hoffman,* 970 F. 2d 1154, 1156 (2d Cir. 1992), the decision that was the basis of the plaintiff's lawsuit was reversed on administrative appeal, mooting the allegation that he was not afforded due process.

alleges that:

    a.  he was not provided an adequate "Notice of Investigation" as required by the 2018 Sexual Misconduct Policy, which called for the Title IX Coordinator to deliver a written notice to Plaintiff which contained "a brief description of the allegations, the portions of the Policy that are alleged to have been violated, and any interim measures put in place about which either Party must be made aware." AC ¶ 116; Defs. Ex. B, at p. 17. Brown did not provide this form of notice to Plaintiff. AC ¶ 161. *See Quinnipiac*, Doc. No. 152, at p. 36 (failure to provide written notice specified in policy supported breach of contract claim).

       Defendants assert, without any support, that Plaintiff had sufficient notice of "an investigation and the charges against him." Moving Br. at p. 19. They do not dispute that the letter provided by Brown did not meet the requirements of the 2018 Sexual Misconduct Policy. Defendants also baldly assert that the "New Policy" was not applied to the case until after the First Hearing, so anything occurring before then, such as in the investigation, cannot have violated the New Policy. Moving Br. at p. 19. Yet the allegations of the Amended Complaint state that Brown applied the 2018 Sexual Misconduct Policy as early as January 23, 2018. AC ¶ 296. Moreover, Defendants fail to recognize that the 2018 Sexual Misconduct Policy afforded Plaintiff rights which he was not given even though, as alleged in the Amended Complaint, Brown elected to rely on that Policy prior to the second hearing. *Id.*

    b.  he was denied his right to inform Brown of any conflicts of interest that might exist with respect to Officer Jacquot. AC ¶ 297(d). As set forth in the Amended Complaint, the 2018 Sexual Misconduct Policy required the Title IX Coordinator to "provide the Parties with the name of the person(s) assigned to investigate the reported conduct….As soon as possible, but no later than three (3) business days after delivery of the identity of the Investigator(s), the Parties should inform the Title IX Compliance Coordinator (in writing) of any conflicts of interest with regard to the selected investigator." AC 116(c). Here, Brown

notified Plaintiff that she appointed Jacquot as Title IX investigator and then—on the same day—referred the matter to Fairfield's disciplinary process. AC ¶¶ 161-164.

c.   the investigation report required by the 2018 Sexual Misconduct Policy was not prepared. AC ¶¶ 166-168, 297(e). Per the 2018 Sexual Misconduct Policy:

> At the conclusion of the Investigation Phase, the Investigator(s) will prepare an Investigative Report, which should include a summary of the factual information presented during the Investigation Phase, a separate section where the Investigator(s) points out relevant consistencies or inconsistencies (if any) between different sources of information, and a separate section describing the Investigator(s)' perception of the demeanor of the individuals interviewed.

AC ¶ 117(a). *See* Defs. Ex. B, at p. 19. Defendants misconstrue the phrase "should include" as "non-mandatory" but the inclusion of the word "should," which is the past tense of "shall," is mandatory."[12] Defendants then assert that the Public Safety "report" contains "analysis"—without citing to any page numbers. Moving Br. at 20. A review of Defendants' Exhibit C demonstrates that the "report" is simply a compilation of the incident report and witness statements taken by Public Safety—it does not include the required categories referenced above.

While Defendants next contend that the so-called "report" pre-dates the 2018 Sexual Misconduct Policy, they ignore that Brown appointed Officer Jacquot as the Title IX investigator on January 23, 2018, after the Policy went into effect. Brown did so in accordance with the 2018 Sexual Misconduct Policy, yet she apparently did not instruct Jacquot to prepare the form of report that was required for purposes of a Title IX investigation. AC ¶ 296; Defs. Ex. C.

d.   Plaintiff was denied the right to provide written comments to the investigation

---

[12] As defined in the Merriam Webster dictionary "shall" means used in laws, regulations, or directives to express what is mandatory. https://www.merriam-webster.com/dictionary/shall. Should is used "to express obligation, propriety, or expediency." https://www.merriam-webster.com/dictionary/should.

report. AC ¶ 297(f). Per the 2018 Sexual Misconduct Policy: "The Parties will have an opportunity to review the Investigative Report and may submit written comments about the content of the Investigative Report to the lnvestigator(s) within five (5) business days of the date they are notified that the Investigative Report is available for review." AC ¶ 117(b), Defs. Ex. B, at pp. 19-20. The purpose of allowing the parties to comment is to determine if further investigation was warranted. *Id.* Per the Amended Complaint, on January 23, 2018, Brown, simply notified Plaintiff that she was in possession of an "investigation report" and that the matter was being referred to the disciplinary process. AC ¶¶ 164-169. She did not give Plaintiff the opportunity to review the report, or submit written comments. *Id.*

e. Donoghue, Dean of Students, was not authorized under either the 2017 or 2018 Sexual Misconduct Policies to elect which policy applied at the first hearing. AC ¶¶ 178-179, 297(h). Per the 2018 Sexual Misconduct Policy, Brown was responsible for deciding which policy to apply: "claims reported prior to January 1, 2018 will generally be reviewed under the prior Sexual Misconduct Policy, unless otherwise determined by the Title IX Compliance Coordinator, in his/her sole discretion, with respect to continuing or ongoing violations or other pertinent circumstances." AC¶ 179, Defs. Ex. B, at 3. Per the Amended Complaint, Brown elected to follow the 2018 Sexual Misconduct Policy in January 2018, as evidenced by her letter to Plaintiff. AC ¶ 296.

f. Plaintiff was denied the opportunity to request reconsideration of the interim measures imposed and review by an independent ombudsperson. AC ¶ 297(i). The 2018 Sexual Misconduct Policy permitted the party upon whom the interim measures were imposed to request reconsideration of those measures. The Title IX Coordinator would appoint an impartial ombudsperson, who was not a member of the Fairfield community, to conduct the review. AC ¶ 115; Defs. Ex. B, at pp. 14-15.

Defendants contend that the 2018 Sexual Misconduct Policy was not in effect "when the interim measures were imposed," ignoring Plaintiff's allegations that

28

interim measures were imposed by Donoghue and "on behalf of Christine Brown" on January 26 and January 30, 2018. AC ¶¶ 175-176. Brown also imposed interim measures after the first hearing, on February 12, 2018. AC ¶ 206.

Defendants also argue that the "language of the policy is permissive" in regard to a student's right to request reconsideration because the 2018 Sexual Misconduct Policy states with respect to "Initial Steps/Interim Measures" that "[t]hese initial steps may include, but are not limited to…." Moving Br. at 20. Defs. Ex. B, at p. 14. However, with respect to interim measures, the Policy states that "[i]nterim measures *are subject to* a Request for Reconsideration by a responding party" and the "Title IX Coordinator *shall* appoint an ombudsperson who will be responsible to issue decisions on all Requests for Reconsideration." Defs. Ex. B, at p. 14 (emphasis added). To the extent any ambiguity or conflict is found between the language cited by Defendants and the provisions of the 2018 Sexual Misconduct Policy that specifically govern requests for reconsideration of interim measures, the Court should apply the doctrine of *contra proferentem*, and construe the policy language against Fairfield.

g. Fairfield failed to follow the "Review and Determination" process set forth in the 2018 Sexual Misconduct Policy. AC ¶¶ 297(j); Defs. Ex. B, at pp. 20-21. Ignoring the allegations that University procedures were not followed, Defendants elected to mischaracterize this breach as Plaintiff's "disagreement with the result." Moving Br. at p. 21.

h. Fairfield failed to apply the preponderance of the evidence. AC ¶ 297(k). This allegation is actionable under a breach of contract theory. *Qunnipiac*, 2019 WL3003830, at *20; *Amherst College*, 238 F. Supp. 3d at 216. Defendants assert, without citation, that this allegation is inactionable because Plaintiff did not state what standard "was applied in *lieu* of the preponderance." Moving Br. at p. 21. The manner in which the second hearing board decided the case—and

29

what standard they did or did not apply—is information that is exclusively within the University's possession, custody and control. However, Plaintiff alleged that there was a lack of credible evidence to support Jane Roe's allegations and the finding against him. AC ¶¶ 182-188, 297(k). He further alleges that the second hearing board was deprived of critical evidence, including Jane Roe's medical records and was biased by Jane Roe's permitted outbursts and threats at the hearing. ¶¶ 208-224. Thus, the finding of the second hearing board was not supported by a preponderance of the evidence.

i. The wrong standard was applied to Plaintiff's appeal. AC ¶ 297(m). As alleged in the Amended Complaint, the 2017 Sexual Misconduct Policy permitted an appeal on the ground that "there was a substantial error in the disciplinary proceedings." AC ¶¶ 104, 232 n. 49; Defs. Ex. A, at p. 107. In contrast, the 2018 Sexual Misconduct Policy permitted an appeal on an arguably less stringent ground--that there were "procedural errors by the investigator(s) or Hearing Board that materially prejudiced the Party requesting review." AC ¶ 232; Defs. Ex. B, at p. 24. President Nemec, who was appointed as appeal officer for unknown reasons, denied Plaintiff's appeal on the ground that it did not provide "adequate evidence to *substantiate an error* in the proceedings." AC ¶¶ 231-243 (emphasis added). Defendants attempt to avoid this clearly alleged policy breach by arguing, without support or citation, that the stated "grounds" for appeal set forth in the policy are not the standards to be applied by the appeal officer and that the determination of the appeal is left to the discretion of the appeal officer. Moving Br. at p. 21. The use of the word "grounds" for appeal in the 2018 Sexual Misconduct Policy undermines these arguments, as do the limitations placed on the appeal officer's decision-making process. AC ¶ 232; Defs. Ex. B, at p. 25.[13]

For these reasons, the Court should deny that portion of Defendants' Rule 12(b)(6) motion, seeking to dismiss Plaintiff's breach of contract claim.

---

[13] Plaintiff hereby withdraws the allegations stated at Paragraph 297(c) (failure to notify of right to advisor) and 297(m) (denial of opportunity to meet with Dean of Students).

### C.  **Plaintiff Has Not Alleged A "Disguised Negligence" Claim**

Defendants' contention that Plaintiff's contract claim is a "disguised negligence" claim fails for the many reasons outlined *supra* Points III.A and B, which clearly demonstrate that Plaintiff's claim sounds in contract. *See Quinnipiac*, Doc. No. 152, at pp. 32-42. Fairfield's comparison of Plaintiff's numerous allegations concerning the manner in which the University breached specific provisions of its own policies—which formed a contractual relationship with Plaintiff—to a slip and fall case in which the plaintiff claimed to be the third-party beneficiary of a snow removal contract nonsensical. Moving Br. at p. 23.

Fairfield's references to the original complaint filed in this action are improper and should not be considered by the Court, as the Amended Complaint superseded the original pleading, and nullified Fairfield's first motion to dismiss. *See T.K., Inc. v. Castleton Capital Corp.*, 2013 WL 12293454 at **1-2 (D. Conn. May 30, 2013) ("'Once an amended pleading is interposed, the original pleading no longer performs any function in the case and any subsequent motion made by an opposing party should be directed at the amended pleading.'") (citation omitted).

Despite Defendants' arguments to the contrary, the damages sought with respect to Plaintiff's breach of contract claim differ significantly from the damages sought with respect to his Title IX claim. *See* AC at pp. 97-98 (prayer for relief). He does not seek damages for emotional distress or pain and suffering as part of his breach of contract claim. AC ¶¶ 300-301. Defendants' contention that Plaintiff would have to allege "lost profits" as part of his breach of contract claim is yet another nonsensical argument. Moving Br. at p. 24.

Plaintiff's request for punitive damages is based on his allegations, fully set forth *supra* Point III.A, that the University acted arbitrarily, capriciously and in bad faith. AC ¶¶ 298-301. *See Rom v. Fairfield U.*, 2006 WL 1493644 at *2 (D. Conn. 2006). Defendants elected not addressed

these allegations with respect to his claim for punitive damages. Nor did they address Plaintiff's

citation to *Rom* at Paragraph 301 of the Amended Complaint.

The Court should deny that portion of Defendants' Rule 12(b)(6) motion seeking to dismiss

Plaintiff's breach of contract claim on the ground that it is a "disguised negligence" claim.

### D.  The Student Handbook Disclaimer Does Not Preclude Liability

Defendants contend—without express recitation of the pertinent Handbook provision—

that the Handbook contains a disclaimer which precludes Plaintiff's breach of contract claim.

Moving Br. at 25. As shown in Defendants' Exhibit A, the cover of the 2017 Handbook states as

follows:

> The policies contained in this handbook are applicable to all Fairfield University
> students-undergraduate, graduate, and part-time. *Students are responsible for being
> aware of these policies and following them accordingly*. Responsible behavior is
> expected of Fairfield students, wherever they are, and the Student Conduct Code
> applies to students both on and off campus. *Enrollment at Fairfield University
> implies acceptance of these policies and procedures and makes them binding on all
> Fairfield students*.
>
> The provisions of this handbook are not to be regarded as an *irrevocable* contract
> between Fairfield University and its students. The University reserves the right to
> change any provision or requirement at any time. Defs. Ex. A, at p. 1 (emphasis
> added).

By its very language, the 2017 Handbook, and its policies, create a contract between Fairfield and

its students, upon their enrollment. The disclaimer refers to the Handbook as a contract but simply

warns that it is not irrevocable. Defendants did not provide a copy of the 2018 Handbook cover

even though they submitted a copy of the 2018 Sexual Misconduct Policy. *See* Defs. Ex. B.

In *Doe v. Quinnipiac*, Judge Arterton rejected Quinnipiac's argument that the university's

far more explicit disclaimer barred the plaintiff's breach of contract claim. 2019 WL3003830, at

*21. The provision at issue in *Quinnipiac* stated that the handbook "does not constitute a contract,

either express or implied, and is subject to change at the University's discretion." *Id.* Judge

Arterton rejected the university's reliance on *Kent Literary Club of Wesleyan University v. Whaley*, 2004 WL 2361686, at *4 (Conn. Super. Ct. Sept. 16, 2004)—which Defendants rely upon here—and, instead, cited the more recent case of *Demoulas v. Quinnipiac University*, 2015 WL 1427951, at *4 (Conn. Super. Ct. Mar. 5, 2015)—which Plaintiff cites in the Amended Complaint—and allowed the breach of contract claim to proceed to trial. *Quinnipiac*, 2019 WL3003830, at *21. *See* AC ¶ 78 n. 25. *See also Gally*, 22 F. Supp. 2d at 210 n. 7 (university could not unilaterally disclaim all contractual relations with students via use of disclaimer in university bulletin). Defendants do not address *Demoulas* in their Moving Brief.

Apart from *Kent Literary Club*, the cases cited by Defendants are inapposite. *Gaudio v. Griffin Health Services*, 249 Conn. 523, 535 (1999), does not address the contractual relationship between university and student. Regardless, in that case the court found that it was reasonable for the jury to conclude that an employer's personnel manual gave rise to a contractual obligation not to terminate its employees without just cause. The manual at issue contained no disclaimer. In *Doe v. French*, 458 Fed. Appx. 21, 23 (2d Cir. 2012), which also addressed the readily distinguishable employer/employee relationship, the Second Circuit applied *New York* law, holding that an employee handbook did not constitute an employment contract when it contained an explicit disclaimer.

*Eiland v. Wolf*, 764 S.W.2d 827, 838 (Tex. Ct. App. 1989) is not only from outside this jurisdiction—and the Second Circuit—but pre-dates *Demoulas* and *Quinnipiac*. Moreover, the disclaimer language at issue in *Eiland* was not, as Defendants contend, precisely the same as the language at issue here. *See Eiland*, 764 S.W. 2d at 838. In *Hope Academy of Milford, Inc. v. Fortier*, 2004 WL 944480, at *4 (Conn. Super. Ct. April 13, 2004), a case involving the payment of tuition to a private school, the disclaimer at issue stated "Hope Academy, its faculty, lessor or

other agents shall have no liability for claims in regard to its curriculum, management, or the success of its program." *Id.*

Plaintiff urges the Court to follow *Demoulas* and *Quinnipiac* and to deny Defendants' motion to dismiss his breach of contract claim.

### E. Plaintiff Alleged A Claim For Breach of the Implied Covenant of Good Faith and Fair Dealing

Defendants argue that the Court should dismiss Plaintiff's claim for breach of the implied covenant of good faith and fair dealing because Plaintiff failed to allege that Fairfield acted in a manner that was arbitrary, capricious or in bad faith. Moving Br. at p. 26. As fully set forth *supra* Point III.A, Plaintiff has plausibly alleged such conduct. *See Jacobs*, 2003 WL 22390051 at **6-7.

Defendants next contend that Plaintiff's implied covenant claim should be dismissed because "there was a thorough investigation, Plaintiff received two separate hearings, the second one at his request, and was represented by an advisor at both." Moving Br. at p. 26. While Defendants treat this unsupported sentence as "fact,"[14] the manner in which the disciplinary proceedings were carried out—and whether they were carried out in breach of the implied covenant—is an issue for the trier of fact. *See Quinnipiac*, 2019 WL3003830, at *22.

Finally, Defendants assert the meritless argument that Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is "precluded by virtue of available statutory remedies" under Title IX and Section 504 of the Rehabilitation Act. Moving Br. at p. 27. Defendants cite no case law which supports this argument. On the contrary, in the recent

---

[14] Indeed, per the well-pled allegations of the Amended Complaint, which must be taken as true at this stage of the proceedings, Fairfield's disciplinary proceedings against Plaintiff were anything but thorough or impartial and he did not "request" a second hearing. AC ¶¶ 134-224. The Dean of Students decided to "nullify" the first hearing and order a second hearing even though she was not authorized to do so. AC ¶¶ 203-206.

*Quinnipiac* decision, Judge Aterton allowed the plaintiff's Title IX and implied covenant claims to go to trial. Doc. No. 152, at pp. 26, 42-43. The cases cited by Defendants pertain specifically to Connecticut General Statutes § 31-51m as an exclusive remedy for employees who are terminated for whistleblowing. *See Campbell v. Plymouth*, 74 Conn. App. 67, 75 (2002); *Pickering v. Aspen Dental Mgmt., Inc.*, 100 Conn. App. 793, 799 (2007). In *Thibodeau v. Design Group One Architects, LLC*, 260 Conn. 691, 718 (2002), the plaintiff had no statutory remedy under the Fair Employment Practices Act because her employer was exempt from sex discrimination claims under the Act. The court also found that the plaintiff's wrongful termination claim was precluded because the Legislature intended to exempt small employers from all forms of discrimination claims. This holding has no bearing on Plaintiff's implied covenant claim.

Defendants contend, without support, that Plaintiff's claim is subsumed by his sex and disability discrimination claims. Moving Br. at p. 27. As alleged by Plaintiff, Fairfield breached the implied covenant of good faith and fair dealing by: i) conducting its own quasi-criminal investigation in violation of Plaintiff's constitutional rights; ii) proceeding outside the scope of any written policy; iii) cherry-picking the provisions of the 2017 and 2018 Sexual Misconduct Policies that benefitted the University and Jane Roe over Plaintiff; iv) providing Plaintiff with hearing procedures that were not in any written policy; v) allowing Jane Roe to hijack the second hearing; vi) restricting Plaintiff's access to campus even though Jane Roe was completing the semester from a remote location; and vii) appointing President Nemec as the appeal officer. AC ¶¶ 302-309. Plaintiff further alleged that the actions were taken with the dishonest purpose of ensuring punishment for Plaintiff so that Fairfield could maintain its legislative data, and reputation, in a manner that showed it was continuing to prosecute male respondents. While Plaintiff has linked Fairfield's bad faith conduct and violation of its policies to a discriminatory purpose, Title IX is

not the exclusive remedy for obtaining relief for the manner in which Fairfield conducted his disciplinary proceedings. Moreover, the foundation of Plaintiff's implied covenant claim is Fairfield's deviation from, or selective adherence to, its handbook and policies.

For these reasons, the Court should deny that portion of Defendants' Rule 12(b)(6) motion which seeks to dismiss the claim for breach of the implied covenant of good faith and fair dealing.

### F.  Plaintiff Alleged A Claim for Negligent Infliction of Emotional Distress

Defendants argue for dismissal of Plaintiff's claim for negligent infliction of emotional distress ("NIED"), by presuming that *Gupta* applies to the claim and asserting that Plaintiff has failed to allege arbitrary, capricious or bad faith conduct. Moving Br. at pp. 27-28.[15] *Gupta* may act as bar to negligence-based and/or "educational malpractice" claims alleged against *educational institutions* absent arbitrary, capricious or bad faith conduct. *See, e.g.*, *Mara*, 2015 WL 432956, at **10-11; *Jacobs*, 2003 WL 22390051, at *6. But Plaintiff has alleged an NIED claim against Defendants Donoghue and Brown in their individual capacities. AC ¶¶ 321-330. *See, e.g. Johnson*, 119 F. Supp. 2d at 100; *Faraclas v. Botwick*, 2002 WL 1727395, at *4 (Con. Super. Ct. 2002).

Plaintiff alleged that, on a number of occasions, he reported to Brown that Jane Roe was engaging in intimidating and threatening behavior which was causing him significant anxiety and distress. AC ¶ 323. He next alleged that Brown and Donoghue failed to stop Jane Roe from repeatedly engaging in harassing and retaliatory behavior. AC ¶ 324. Plaintiff further alleged that Donoghue's reversal of Brown's decision to accommodate his requests to attend labs and certain classes caused him emotional distress. AC ¶ 325. Both Brown and Donoghue were aware, throughout the disciplinary process, that Plaintiff was suffering from anxiety and depression as a result of Jane Roe's public decimation of his reputation and deliberate attacks on his character. AC

---

[15] Defendants do not argue that Plaintiff's NIED claim was not plausibly alleged under a negligence standard or that he has not adequately pleaded the requisite elements of this claim.

¶ 325. Donoghue's conduct toward Plaintiff "was so hostile…that he was uncomfortable attending meetings with her without a third-party present." AC ¶ 327. Given their awareness that Plaintiff was suffering emotional distress, it was foreseeable to Brown and Donoghue that their failure to remedy Jane Roe's harmful conduct towards Plaintiff, or accommodate his disability, would result in increased anxiety and consequent physical symptoms for Plaintiff. AC ¶ 328. As a result of Brown's and Donoghue's failure to address these issues, Plaintiff suffered panic attacks, insomnia, social anxiety and exhaustion. ¶ 329.

Because these allegations support Plaintiff's claim under both the "negligence" and "arbitrary and capricious" standards, the Court should deny that portion of Defendants' Rule 12(b)(6) motion seeking to dismiss Plaintiff's NIED claim.

## IV.    Plaintiff Alleged A Plausible Disability Discrimination Claim

Defendants' argument that Plaintiff's disability discrimination claim, (Count IV), should be dismissed is unavailing. Defendants argue that Fairfield did not have to accommodate Plaintiff's known ADHD diagnosis, and his request to take certain labs and classes on campus, during his "deferred dismissal" period because "a university is not required to modify its disciplinary practices as an accommodation to a disabled student." Moving Br. at. 29. However, the cases Fairfield cites in support of this assertion are inapposite.

In *Bercovitch v. Baldwin School, Inc.*, 133 F.2d 141, 152-153 (1st Cir. 1998), which concerned the issuance of a preliminary injunction, the plaintiff caused regular disruptions in the classroom and he, and his parents, insisted that he be exempted from the normal operation of the school's disciplinary code, and system of progressive discipline. *Id.* The plaintiff and his parents requested that he be suspended only after three warnings and then only for the remainder of the day. *Id.* The court found that the request constituted an "alteration of a fundamental requirement

37

of the school's academic program" under the ADA. *Id.* The record was also "replete with efforts" to accommodate the plaintiff. *Id.*

Similarly, in *Stearns v. Bd. of Education for Warren Township High School District* #121, No 00 C 5818, 1999 WL 1044832 at *3 (N.D. Ill. Nov. 16, 1999), the plaintiff, an alcoholic, sought to be reinstated to a sports team even though he had lost his eligibility to play due to his admitted violation of the school's alcohol ban. *Id.* The court noted that the Rehabilitation Act expressly permitted schools to punish disabled students for using alcohol and found that the defendants were insulated from liability under the Act. *Id.* The court further noted that reinstating the plaintiff despite the defendant-school's rule banning alcohol would eviscerate the rule itself. *Id.*

In contrast, Plaintiff, here, alleges that he participated in the disciplinary process set forth in Fairfield's handbook and policies, and was also subjected to some procedures that fell outside those policies. AC ¶¶ 76-243. Fairfield had no definitive rule about sanctioning in sexual misconduct cases or the form of punishment that would result for a given policy violation. Indeed, the 2018 Sexual Misconduct Policy stated:

> Sanctions regarding students…will be determined by the Dean of Students. The Dean of Student's [*sic*] determination will be shared with the Parties in writing. All parties may request the opportunity to meet with the Dean of Students within three (3) days following the determination. Defs. Ex. B, at p. 22.
>
> ….
>
> For students, sanctions "may include but are not limited to…expulsion, dismissal, reprimand, warning, restitution, education/counseling, no-contact order, restriction from extracurricular programs or activities, loss of leadership opportunity or positions in activities, housing restriction/relocation, and/or loss or restriction from College employment." AC ¶ 119(e); Defs. Ex. B, at p. 23.

Plaintiff alleged that: even though he received a "deferred dismissal" he was allowed to complete his coursework for the semester remotely; Jane Roe was no longer taking courses on campus and

he did not share any classes with her; he requested an accommodation for his lab work and certain classes, which was backed by documentation from his physicians and his professors; and Plaintiff had at all times been compliant with the terms of the no contact order and interim restrictions imposed on him throughout the Title IX process. AC ¶¶ 225-230, 313-320. As stated in the Amended Complaint, and evidenced by the relevant Policy language, the requested accommodations "would not have resulted in Fairfield having to alter its Sexual Misconduct Policies or Student Conduct Code—the sanctions arrived at in each disciplinary matter were not uniform, but decided on a case-by-case basis." AC ¶ 317. Unlike the cases relied upon Defendants to argue for dismissal, Plaintiff's requested accommodation did not require Fairfield to eviscerate any rules or change its disciplinary process. *See Thurmon v. Mount Carmel High School*, 191 F. Supp. 3d 894, 898 (N.D. Ill. 2016) ("Section 504 requires schools to…account for disabilities when imposing disciplinary measures and prohibits retaliation against students who request accommodations.")

Donoghue's reversal of Brown's approval of Plaintiff's requested accommodation concerns whether Fairfield retaliated against Plaintiff for requesting an accommodation, or acted with deliberate indifference towards Plaintiff. *See Thurmon*, 191 F. Supp. 3d at 898-899; *Girard v. Lincoln College of New England*, 27 F. Supp. 3d 289, 299 (D. Conn. 2014). Unlike *Uhl v. Home Depot U.S.A., Inc.*, 2010 WL 3282611, at *5 (E.D.N.Y. 2010), decided at the summary judgment stage, Plaintiff has not alleged that his request was reasonable because it was the same as—or similar to—an accommodation that Fairfield had previously granted. Nor is this the same situation as in *Meyers v. Conshocken Catholic School*, 2004 WL 3037945, at *9 (E.D. Pa. 2004), also a summary judgment decision, where Plaintiff has alleged, or Defendants have provided evidence

that, Fairfield previously provided accommodations for his ADHD that "were beyond the scope of the ADA's requirements." *See* AC ¶¶ 225-230, 313-320.

For the above stated reasons, the Court should deny that portion of Defendants' Rule 12(b)(6) motion seeking dismissal of Plaintiff's disability discrimination claim under Section 504 of the Rehabilitation Act.

## **CONCLUSION**

For all of the reasons stated above, Plaintiff respectfully submits that Defendants' motion to dismiss be denied in its entirety, along with such other and further relief that the Court deems just and proper.

Dated: July 23, 2019

**Respectfully Submitted,**

/s/ Andrew T. Miltenberg
Andrew T. Miltenberg (*pro hac vice*)
Stuart Bernstein (*pro hac vice*)
Kara L. Gorycki (*pro hac vice*)
NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001
Email: AMiltenberg@nmllplaw.com
Email: SBernstein@nmllplaw.com
Email: Kgorycki@nmllplaw.com

**-and-**

/s/ William Bilcheck, Jr.
William Bilcheck, Jr.
LAW OFFICES OF WILLIAM BILCHECK, JR.
12 Brookside Road
P.O. Box 281
Madison, Connecticut 06443
Email: madctatty@aol.com
CT Juris: 309654
Fed. Juris: 04402

***ATTORNEYS FOR PLAINTIFF***
